958 P.2d 459

RACHELLE S. and Mark B., Appellants,

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY,
Marcus B., Appellees.**

**No. 1 CA-JV 97-0208.**

Court of Appeals of Arizona,
Division 1, Department B.

May 14, 1998.

Grant Woods, Attorney General By Julia R. Rutherford, Assistant Attorney General, Kingman, for Appellees.

Law Offices of Kirk S. Cookson By Kirk S. Cookson, Lake Havasu City, for Appellants.

EHRLICH, Judge.

¶1 Rachelle S. and Mark B., the biological parents of Marcus S., appeal from the juvenile court's order adjudicating Marcus to be dependent. The issue on appeal is whether the court's finding of likely, serious emotional or physical harm to the child is supported by expert testimony as required by the Indian Child Welfare Act, 25 United States Code ("U.S.C.") 1901 *et seq.* (1994) ("the Act"). Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2 Marcus was born on September 21, 1996. During the first few months of his life, various family members provided care for him. On February 1, 1997, Rachelle became concerned about Marcus' health because he was running a high fever and was unable to retain any food. She took the baby to Mohave Valley Medical Center to "have a checkup."

¶3 Marcus was lethargic upon arrival at the hospital, and he was experiencing seizures. He also presented with a bulging fontanel and was unable to support his head. The baby was transported by helicopter to Sunrise Hospital and Medical Center in Las Vegas because of medical concern over his seizures, the condition of his fontanel and his "decreased mental status."

¶4 The receiving physician at Sunrise's pediatric intensive care unit, Jeremy Garrett, described Marcus as an "acutely severely ill infant" who presented with bleeding characterized as a "massive, severe subdural hematoma." Unable to otherwise explain the extensive bilateral retinal hemorrhages present in the baby upon arrival at Sunrise, Dr. Garrett suspected that Marcus was the victim of non-accidental trauma, probably shaken-baby syndrome.[1]

¶5 Two days after Marcus was admitted to Sunrise, the Arizona Department of Economic Security ("DES") Child Protective Services was notified that Marcus was possibly the victim of "acute and chronic abuse." Detectives from the Mohave County Sheriff's Office interviewed family members who had cared for Marcus, but they were unable to determine the identity of the perpetrator(s). In fact, no family member was willing to acknowledge that the baby had been abused. Due to the severity of Marcus' injuries and the inability to determine their source, DES filed a dependency petition, alleging that continuation of the child in the home would be contrary to his welfare. DES added that Marcus is an Indian child as defined by the Act.

¶6 A contested dependency hearing was held on August 27 and 29, 1997. The juvenile court heard from James Grant, Marcus' case manager and a child-protective specialist, regarding the reasons why DES was seeking a dependency order. The agency also presented testimony from three physicians, each of whom opined that Marcus was the victim of shaken-baby syndrome.

¶7 Rachelle and Mark offered testimony from a radiologist and a child neurologist. However, each recognized that Marcus' symptoms could lead to an opinion of shaken-baby syndrome.

¶8 The juvenile court decided that continued custody with Rachelle and Mark would likely result in continued serious physical or emotional harm to Marcus. It found by clear and convincing evidence that Marcus should be declared dependent.

### DISCUSSION

¶9 A decision by the juvenile court in a dependency proceeding regarding the weight and effect of evidence will not be disturbed on appeal unless it is clearly erroneous. *E.g., Maricopa County Juvenile Action No. J–75482*, 111 Ariz. 588, 591, 536 P.2d 197, 200 (1975). Accepting this standard of review, Rachelle and Mark argue that the court's determination is not supported by testimony from a qualified expert as required by the Act because none of DES' witnesses has any expertise regarding Indian children.

¶10 The Act was passed in response to "an alarmingly high percentage of Indian

---

1. "Shaken baby syndrome" was defined as "a constellation of abnormalities that occur in infants after they have been vigorously shaken," including retinal hemorrhages, brain injury, brain swelling and subdural hematomas.

families ... broken up by the removal ... of their children" and placed in non-Indian homes. 25 U.S.C. § 1901(4).[2] Congress mandated that there be federal standards for state-court child-custody proceedings, defined to include foster-care placement, 25 U.S.C. § 1903(1)(i), including the following requirement for placement proceedings:

No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e).

■ ¶ 11 Rachelle and Mark interpret this section of the Act to mean that a person can never qualify as an expert unless that individual has expertise with Indian children, regardless of the issue(s) before the court. The statute imposes no such requirement.

¶ 12 Although regulations have not been promulgated, the United States Department of the Interior Bureau of Indian Affairs has issued guidelines for state courts to assist us in interpreting the Act. *Guidelines for State Courts; Indian Child Custody Proceedings,* 44 Fed.Reg. 67,584 (1979) ("Guidelines"). These Guidelines have been relied on by Arizona courts in a number of cases. *See Maricopa County Juvenile Action No. JS–8287,* 171 Ariz. 104, 108, 111, 828 P.2d 1245, 1249, 1252 (App.1991); *Maricopa County Juvenile Action No. A–25525,* 136 Ariz. 528, 532 n. 4, 667 P.2d 228, 232 n. 4 (App.1983); *Pima County Juvenile Action No. S–903,* 130 Ariz. 202, 206, 635 P.2d 187, 191 (App.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). The Guidelines state in relevant part:

D.4. Qualified Expert Witnesses

* * *

(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.

44 Fed.Reg. at 67,593.

¶ 13 The Commentary to this section adds:

The second subsection makes clear that knowledge of tribal culture and childrearing practices will frequently be very valuable to the court. Determining the likelihood of future harm frequently involves predicting future behavior—which is influenced to a large degree by culture.

*Id.*

¶ 14 The Guidelines thus only suggest that individuals with a certain experience are "most likely to meet the requirements for a qualified expert witness." Neither they nor the Act limit a qualified expert exclusively to someone with expertise with Indian children or culture. Drawing on the Guidelines and the Act, this court has said that an expert must be qualified to make "substantially more reliable judgments than those of a non-expert," but " '[s]pecial knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias.' " *Juvenile Action No. JS–*

---

**2.** Congress declared its policy to be:
to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture....
25 U.S.C. § 1902.

*828[7]*, 171 Ariz. at 111, 828 P.2d at 1252, quoting *Matter of N.L.*, 754 P.2d 863, 867 (Okla.1988). This interpretation—that distinctive knowledge of Indian culture is necessary only when cultural mores are involved—is consistent with the Act's overall concern,[3] as other courts have similarly concluded. *See In the Matter of Baby Boy Doe*, 127 Idaho 452, 902 P.2d 477, 485 (1995) ("Special knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias." Citations omitted.); *In re Interest of C.W.*, 239 Neb. 817, 479 N.W.2d 105, 112 (1992) ("Dr. Melton possesses substantial education and experience in his area of specialty [clinical psychology], and his lack of experience with the Indian way of life in no way compromised or undermined the value of his testimony."); *K.E. v. State*, 912 P.2d 1002, 1005 (Utah App.1996) ("We note that professionals having substantial education and experience in child welfare might well qualify as expert witnesses under [the Act], even though their experience with Indians is limited." Citations omitted.); *State ex rel. Children's Services Division v. Campbell*, 122 Or.App. 371, 857 P.2d 888, 889 (1993) ("(W)hen cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life." Citation omitted.); *D.W.H. v. Cabinet for Human Resources*, 706 S.W.2d 840, 843 (Ky.App.1986) ("The failure of these experts to possess special knowledge of Indian life was not fatal and the court did not abuse its discretion in admitting testimony of 'professional persons having substantial education and experience in the area of his or her specialty.'" Citations omitted.).

¶ 15   The question before the juvenile court in this case was whether Marcus had been the victim of shaken-baby syndrome and whether he would be likely to suffer continued physical abuse if he were returned to the custody of Rachelle and Mark. We have been given no cultural dictate or explanation that could shed any light on the decision the court had to make. Whether Marcus would likely suffer serious emotional or physical harm if returned to an environment where he had been the victim of near-fatal, non-accidental trauma required expert testimony on the character and severity of the abuse he experienced and on the risks of continued abuse.

¶ 16   As an attending physician, Dr. Garrett had treated more than sixty infants for shaken-baby syndrome, and he had participated in the treatment of a number of others. He testified that Marcus had a "very poor, or a very high risk of mortality and very high risk of morbidity continuing in life, not just related to these previous events, but his risk to subsequent events." Garrett supported this opinion that a declaration of dependency was necessary because the family members evinced a lack of "any motivation to protect [Marcus] in the future or make any changes that would protect the child from future abuse." This was sufficient testimony as required by the Act on the issue whether serious emotional or physical damage to Marcus would result if he were returned to the custody of Rachelle and Mark.

## CONCLUSION

¶ 17   The order of the juvenile court adjudicating Marcus dependent is affirmed.

TOCI, C.J., and GERBER, J., concur.

---

**3.** This construction also is in accord with Ariz. R. Evid. 702 which allows expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue...."