244 P.3d 574

**BRENDA O., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, B.L. and M.L., Appellees.**

**No. 1 CA–JV 10–0073.**

Court of Appeals of Arizona, Division 1, Department B.

Dec. 7, 2010.

Gates Law Firm, L.L.C. By S. Marie Gates, Phoenix, Attorneys for Appellant.

Terry Goddard, Arizona Attorney General By Michael F. Valenzuela, Assistant Attorney General, Phoenix, Attorneys for Appellee Arizona Department of Economic Security.

## OPINION

JOHNSEN, Judge.

¶ 1 Brenda O. argues the superior court erred in terminating her parental rights because it incorrectly applied the expert-witness requirement in 25 U.S.C. § 1912(f) (2006), part of the federal Indian Child Welfare Act ("ICWA"). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Brenda is an enrolled member of the Navajo Nation. In August 2007, the Arizona Department of Economic Security ("ADES") removed Brenda's five-month-old daughter, B., because Brenda was too intoxicated to care for her, and the superior court entered a dependency order. In September and October 2007, ADES twice referred Brenda to TERROS, a substance-abuse treatment center, but she missed both intake sessions. In April 2008, Brenda was incarcerated on a probation violation resulting from an earlier conviction for driving under the influence; she was released in October 2008.

¶ 3 Brenda's second child, M., was born in October 2008. Two months later, ADES removed M. from Brenda's care after Child Protective Services ("CPS") visited Brenda's home and found her so intoxicated that she was "unable to stand still, walk straight, or look anyone straight in the eye." CPS again referred Brenda to TERROS in May 2009. Brenda arrived intoxicated for the first two scheduled intake sessions. After she finally completed an intake appointment on June 22, 2009, she began attending an intensive outpatient group, but she was intoxicated at several group sessions.

¶ 4 Brenda also was intoxicated during about 60 percent of her visits with her chil-

dren. The visit supervisor testified Brenda would go to the bathroom during visits and return with alcohol on her breath. She testified Brenda was aggressive during visits and used vulgar language to the point that she was no longer allowed to have her visits at the visitation center.

¶ 5 ADES offered Brenda parent-aide services, bus passes, additional substance abuse counseling and a psychological evaluation. She was required to undergo 56 urinalysis tests but participated in only five. She declined to participate in substance abuse services through Native American Connections, Alcoholics Anonymous or any inpatient program. ADES discontinued parent-aide services because Brenda so often showed up intoxicated. Brenda missed a psychological evaluation appointment in September 2007 and another psychological appointment in 2008. She finally appeared for a psychological evaluation in June 2009.

¶ 6 On May 11, 2009, ADES filed a motion to terminate Brenda's parental rights on the ground that she was "unable to discharge [her] parental responsibilities because of a history of chronic abuse of ... alcohol." With respect to B., the State also alleged the child had been in out-of-home care for 15 months and that Brenda was unable to remedy the circumstances that had brought the child into care.

¶ 7 The court took evidence on September 17 and 24, 2009, and January 25, 2010. A TERROS counselor testified that even after the first two days of trial, Brenda continued to arrive intoxicated for therapy sessions. TERROS closed her case in October 2009 after she did not show up for a session but was found asleep at a nearby bus stop.

¶ 8 The superior court terminated Brenda's rights on both alleged grounds. *Inter alia,* the court found ADES "proved beyond a reasonable doubt that custody of the children by mother is likely to result in serious emotional or physical damage to the children and that this finding is supported by the testimony of a qualified expert witness." The court based its decision in large part on the testimony of Dr. John DiBacco, the li-

censed psychologist who performed Brenda's psychological evaluation. According to DiBacco, Brenda "denied she had a drinking problem" and "essentially minimized, if not denied, that alcohol's been a major problem for her." Brenda's inability to refrain from drinking prior to visits with her children and prior to alcohol-counseling sessions demonstrated that she could not control her drinking, DiBacco said. He concluded the evidence "suggests very strongly that this is uncontrolled consumption at a pathological level."

¶ 9 Brenda timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 8–235 (2007).

## DISCUSSION

 ¶ 10 On appeal, Brenda does not contest the superior court's findings and conclusions with respect to the state-law grounds on which the court ordered severance; nor does she argue the court incorrectly concluded severance was in the best interests of her children.[1] She argues only that the court erred by terminating her rights in the absence of evidence from an expert witness as required by ICWA that "serious emotional or physical damage" was likely to occur to the children if they are returned to her. 25 U.S.C. § 1912(f).

¶ 11 ICWA limits a state's power to terminate the parental rights of a member of an Indian tribe. *See generally* 25 U.S.C. §§ 1901–1963 (2006). In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4). Congress also found that child custody proceedings under state law "have often failed to recognize the essential tribal relations of Indian people and the cultural and social stan-

---

1. We will affirm an order terminating a parent-child relationship "unless it is clearly errone-

ous." *Jesus M. v. Ariz. Dep't of Econ. Sec.,* 203 Ariz. 278, 280, ¶ 4, 53 P.3d 203, 205 (App.2002).

dards prevailing in Indian communities and families." 25 U.S.C. § 1901(5).

¶ 12 At issue here is the ICWA requirement that a tribe member's parental rights not be terminated "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

¶ 13 We interpret statutes *de novo. State ex rel. Ariz. Dep't of Revenue v. Capitol Castings, Inc.*, 207 Ariz. 445, 447, ¶ 9, 88 P.3d 159, 161 (2004). "In interpreting a federal statute, our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 570, ¶ 14, 190 P.3d 180, 184 (2008) (internal quotation omitted). ICWA is to be interpreted "liberally in favor of the Indians' interest in preserving family units." *Id.*

¶ 14 The United States Department of the Interior Bureau of Indian Affairs has issued guidelines ("Guidelines") to assist state courts in interpreting ICWA. Though the Guidelines are not mandatory, many Arizona courts have relied upon them. *Rachelle S. v. Ariz. Dep't of Econ. Sec.*, 191 Ariz. 518, 520, ¶ 12, 958 P.2d 459, 461 (App.1998) (collecting cases). The Guidelines identify the following categories of witnesses likely to satisfy ICWA's expert witness requirement:

[i.] A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

[ii.] Any expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

[iii.] A professional person having substantial education and experience in the area of his or her specialty.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67, 584, D.4 (Nov. 26, 1979).

¶ 15 Notwithstanding that a non-Indian may qualify as an expert by virtue of experience and knowledge of a tribe's social and cultural standards and childrearing practices, neither ICWA nor the Guidelines "limit a qualified expert exclusively to someone with expertise with Indian children or culture." *Rachelle S.*, 191 Ariz. at 520, ¶ 14, 958 P.2d at 461; *see Steven H.*, 218 Ariz. at 571, ¶ 18, 190 P.3d at 185. To the contrary, "distinctive knowledge of Indian culture is necessary only when cultural mores are involved" in the termination determination. *Rachelle S.*, 191 Ariz. at 521, ¶ 14, 958 P.2d at 462. When "matters not implicating cultural bias" are at issue, a witness with "substantial education and experience" need not have "special knowledge of Indian life." *Id.; see In re Baby Boy Doe*, 127 Idaho 452, 902 P.2d 477, 485 (1995); *State ex rel. Juvenile Dep't of Lane County v. Tucker*, 76 Or.App. 673, 710 P.2d 793, 799 (1985) ("when cultural bias is clearly not implicated, the necessary proof may be provided by expert witnesses who do not possess special knowledge of Indian life").

¶ 16 In *Rachelle S.*, for example, a child had been removed from his parents after suffering a severe head injury. 191 Ariz. at 519, ¶ 8, 958 P.2d at 460. At issue during the dependency trial were the cause of the trauma the child suffered and whether the child would suffer additional abuse if he were returned to his parents. *Id.* at 521, ¶ 15, 958 P.2d at 462. The child's attending physician testified the child likely was a victim of shaken-baby syndrome. *Id.* at 519, ¶ 6, 958 P.2d at 460. This court held the physician qualified as an expert witness pursuant to 25 U.S.C. § 1912(f) because he had knowledge and experience regarding shaken-baby syndrome and because the likelihood of future abuse did not implicate any "cultural dictate or explanation." *Id.* at 521, ¶ 15, 958 P.2d at 462.

¶ 17 DiBacco, the psychologist who opined that Brenda's drinking problem likely was "pathological," received his doctorate in psychology in 1975 and has practiced in Arizona since then. He testified he has "worked with Native Americans [for] most of [his] career,"

including 10 years of work with the Tohono O'odham Nation. He also has consulted for "the Indian Head Start program" and has worked with Navajo, Hopi and Apache clients.

¶ 18 As to whether alcohol abuse is prevalent among the Navajo, DiBacco testified, "Generally alcohol abuse and drug abuse is a problem for most of the nations, Navajo included." He explained:

And again, some of these comments are pertinent to many of the other nations as well, but there's some speculation in terms of genetic propensity and, you know, particular genetic proclivity toward alcohol abuse and that's a genetic explanation. But often times it's tied up with the social, cultural aspects of the reservation. For instance, being isolated and essentially there being a higher prevalence of depression among some nations, including Navajo, and alcohol is seen as a palliative response to those sociological culture aspects.

DiBacco later was asked whether Brenda would be unable to remain sober because she is Navajo. To that, he responded:

No. No, I mean the majority of Navajo people do not have a drinking problem. Do they have a higher incidence than the general populations? Yes, probably. And that percentage varies from tribe to tribe and based on their cultural experiences. And again, there may be some genetic propensity as well, but just because she's Navajo or Hopi or Pima doesn't mean she's doomed to become an alcoholic or she would not be able to stop because of that genetic makeup.

DiBacco added that although Brenda had lived on a reservation in the past, she more recently had lived in Phoenix "for a good period of time."

¶ 19 DiBacco's psychological evaluation of Brenda plainly was within his expertise as a professional psychologist. *See Steven H.*, 218 Ariz. at 571, ¶ 18, 190 P.3d at 185. For purposes of this decision, however, we will assume without deciding that the record contained insufficient evidence that DiBacco pos-

sessed "substantial experience in the delivery of child and family services" among the Navajo tribe or "extensive knowledge of prevailing social and cultural standards and childrearing practices" among the Navajo. *See* Guidelines, subparts ii and iii.

¶ 20 Nevertheless, on this record, we conclude DiBacco qualified as an expert witness within the meaning of 25 U.S.C. § 1912(f). Brenda offered no evidence to dispute DiBacco's testimony that although there may be a higher incidence of alcohol abuse among members of some tribes, neither genetics nor tribal culture prevents her from controlling her consumption of alcohol. DiBacco testified Brenda would not be able to begin to address her drinking problem until she acknowledged its existence. Unfortunately, however, Brenda refused to admit she abused alcohol and continued to drink heavily even when she knew she was under scrutiny as part of the severance proceedings. Moreover, there was no evidence at trial that Navajo culture or mores are relevant to the effect Brenda's demonstrated alcohol problem has on her children. Nor on appeal are we offered any authority for the proposition that a parent's alcoholism affects an Indian child differently than any other child.

¶ 21 Accordingly, because DiBacco testified about a matter within his professional specialty, we conclude he was an expert witness qualified to testify that Brenda's continued custody of her children would be "likely to result in serious emotional or physical damage" to the children, pursuant to 25 U.S.C. § 1912(f). *See In re Interest of C.W.*, 239 Neb. 817, 479 N.W.2d 105, 112 (1992) (affirming termination of parental rights of tribe member based on "abuse of intoxicating liquor and drugs" even though licensed psychologist and certified clinical psychologist who testified lacked "experience with the Indian way of life").[2]

¶ 22 DiBacco's testimony also provided the future-looking evidence required by ICWA. He testified that "alcohol impairs judgment and makes the—or causes the parent to be less available, if not unavailable emotionally and physically." He further testified that

---

**2.** Although 25 U.S.C. § 1912(f) refers to "qualified expert witnesses," no more than one qualified expert witness is required. *D.A.W. v. Alaska,*

699 P.2d 340, 342 (Alaska 1985); *see People ex rel. M.H.,* 691 N.W.2d 622, 625 n. 2 (S.D.2005).

Brenda would need to remain sober for a minimum of one year before the children safely could be returned to her, and even then she would require follow-up treatment. In the meantime, DiBacco's opinion was that "until [Brenda] comes to grips with her alcohol abuse/dependency issue, she is placing her children at significant risk."

¶ 23 "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion." *E.A. v. State Div. of Family & Youth Serv.*, 46 P.3d 986, 992 (Alaska 2002). DiBacco's testimony in this case was supported fully by other witnesses who testified that Brenda was belligerent and aggressive when drinking and that her drinking prevented her from bonding with B.

¶ 24 The superior court's thorough order terminating Brenda's rights reflected a careful consideration of all the evidence. The order noted that Brenda persistently had been "intoxicated, hostile and verbally abusive" at visits with her children and at counseling sessions but had refused "services to address her problem" and "continues to deny that she has a problem."

¶ 25 We conclude that DiBacco's testimony and the other evidence recounted above amply satisfied ICWA's requirements. In sum, the evidence before the court constituted a sufficient basis for its finding that returning the children to Brenda's custody "is likely to result in serious emotional or physical damage to the child[ren]." 25 U.S.C. § 1912(f).

## CONCLUSION

¶ 26 For the foregoing reasons, we affirm the superior court's order terminating Brenda's parental rights.[3]

CONCURRING: MICHAEL J. BROWN, and JOHN C. GEMMILL, Judges.

**3.** After the court issued this decision as a memorandum decision, the State moved for an order designating the decision as an opinion. The court invited Brenda to respond to the motion, but she did not. In the absence of a response from Brenda and because publication is warrant-

ed pursuant to Arizona Rule of Civil Appellate Procedure 28(b)(1) and (4), we withdraw the memorandum decision and grant the motion to publish. We reaffirm our order in the prior decision amending the caption to refer to the children by their initials.