NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CHARLOTTE G., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, B.G., W.G., *Appellees*.

No. 1 CA-JV 14-0102
FILED 12-18-2014

Appeal from the Superior Court in Maricopa County
No. JD21348
The Honorable Susanna C. Pineda, Judge
The Honorable Roland J. Steinle, III, Judge

**AFFIRMED**

COUNSEL

John L. Popliek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Patricia K. Norris and Judge John C. Gemmill joined.

---

**W I N T H R O P**, Judge:

**¶1**        Charlotte G. ("Mother") appeals the juvenile court's order terminating her parental rights to B.G. and W.G. (collectively, "the children"). The children are members of the Gila River Indian Community ("Tribe").[1] On appeal, Mother does not contest that the statutory grounds for severance were proven, that there was a substantial likelihood that she would not be capable in the near future of exercising proper and effective parental care and control, and that severance of the relationship was in the best interests of the children. Mother contends, however, that the juvenile court erred in terminating her parental rights because the State failed to prove additional elements necessary to terminate a parent-child relationship under the Indian Child Welfare Act ("ICWA"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        Mother is the biological parent of B.G. and W.G. The natural father of the children is deceased. In June 2011, the children found Mother extremely intoxicated and unresponsive and called 911. The Arizona Department of Economic Security ("ADES") was notified and Mother subsequently agreed to participate in substance abuse classes through Native American Connections.[2] Mother did not participate in these services. ADES filed a dependency petition in January 2012 alleging Mother neglected the children due to her substance abuse. The children

---

[1]        Mother is a member of the Navajo Nation. Prior to his death, Father was a member of the Gila River Indian Tribe.

[2]        In May 2014, Child Protective Services ("CPS") was replaced by the Department of Child Safety ("DCS"), an entity outside of ADES. In its answering brief, DCS refers to the parties as they existed at the time of the proceedings, and so do we.

were removed from Mother's custody and initially placed with maternal grandmother. The juvenile court found the children dependent as to Mother in May 2012 and approved a case plan for family reunification. ADES offered Mother several services including substance abuse testing and treatment, parenting classes, parenting aide services, and a psychological evaluation. In September 2012, the children were placed in paternal grandmother's custody.[3]

¶3        From December 2012 to October 2013, during four separate report and review hearings, the juvenile court found ADES was making active efforts to reunify the family. At the same time, however, the juvenile court noted that Mother was failing to cooperate with TASC and TERROS and repeatedly found that returning custody of the children to Mother without modification of Mother's behaviors was likely to result in serious emotional and physical danger to the children. Nevertheless, the juvenile court in March of 2013 granted Mother a six-month extension to participate and comply with the continuing active efforts by ADES for reunification of the family.[4]

¶4        In October 2013, the juvenile court changed the case plan to severance and adoption. ADES filed a motion for termination of the parent-child relationship, alleging two specific grounds. First, ADES asserted Mother was unable to discharge her parental responsibilities because of a history of controlled substances and/or alcohol abuse and there were reasonable grounds to believe the condition will continue for a prolonged indeterminate period. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3).[5] Next, ADES alleged the children had been in an out-of-home placement for a cumulative total period of fifteen months or longer, pursuant to a court order. *See id*. at § 8-533(B)(8)(c). ADES also alleged the best interests of the children would be served by terminating the parent-child relationship. *See id*. at § 8-533(B).

---

[3]        Paternal grandmother meets the placement preferences under ICWA.

[4]        From December 2012 to October 2013, Mother completed approximately 28% of her required TASC urinalysis testing.

[5]        We cite the current version of the statutes if no revisions material to our decision have occurred since the relevant dates.

¶5 The juvenile court conducted a termination hearing in March 2014, during which Mother, two caseworkers from CPS, and one caseworker from the Tribe testified. Mother testified she began drinking at age 14, stating that the current period of sobriety stemming from her then current inpatient treatment was the longest period she had been sober aside from her pregnancies. Mother also admitted to using methamphetamine in 2010, but maternal grandmother's early intervention led Mother to enter an inpatient program. Mother explained she relapsed with alcohol in June 2011, which prompted ADES' involvement and attempts to engage Mother in services. Mother testified that over the course of approximately two years, she successfully completed two inpatient programs, but failed to engage in either aftercare program, and subsequently relapsed each time. In early 2013, TERROS assisted Mother in finding another inpatient treatment facility, but she failed to attend four separate scheduled intakes at such facility. At the time of the hearing, Mother was receiving inpatient treatment at a tribal community-based treatment facility.

¶6 The tribal caseworker testified that, because Mother was now in a tribal community-based treatment program, the Tribe was, pending completion of that treatment and successful completion of some after-care program, no longer in favor of severance and adoption. The tribal caseworker agreed, however, that returning custody of the children to Mother at this time would likely result in serious emotional or physical damage to the children. In addition, the tribal caseworker agreed that ADES had previously made active efforts "[at] giving Mo[ther] the help that she needed, specifically inpatient treatment." The tribal caseworker stated she assisted Mother in entering Mother's then current inpatient program located on the reservation because the tribal caseworker had "close connections" with this facility. According to the tribal caseworker, CPS did not assist her in this placement effort.

¶7 A CPS supervisor for the ICWA unit testified that ADES offered Mother several services, including substance abuse treatment with TERROS, urinalysis testing with TASC, and inpatient referrals for substance abuse treatment facilities. The CPS ICWA supervisor further testified regarding Mother's failure to engage in offered services, including Mother's failure to participate in TERROS referrals and her "sporadic" testing at TASC. The CPS ICWA supervisor testified that ADES made active efforts under ICWA and that returning custody of the children to Mother would likely result in serious emotional or physical damage to the children.

¶8 The CPS case manager assigned to Mother's case beginning in June 2013 testified that Mother was unable to discharge her parental responsibilities due to her chronic abuse of drugs and alcohol and this condition was likely to continue for an indeterminate period of time. Based on Mother's failure to maintain sobriety or participate in ADES' offered programs, the CPS case manager opined that Mother had failed to remedy the circumstances causing out-of-home placement and was not capable of exercising care and control of the children. The juvenile court terminated Mother's parental rights on April 10, 2014.[6] Mother timely appealed. We have appellate jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9; A.R.S. § 8-235(A); and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

¶9 On appeal, Mother raises several issues regarding ADES' alleged failure to prove the necessary elements to terminate a parent-child relationship under ICWA. Specifically, Mother argues (1) the juvenile court erred in holding the State had by clear and convincing evidence proved it made active efforts to maintain and restore the Indian family unit; (2) the juvenile court erred in holding that the State proved beyond a reasonable doubt that continued custody of the children by the parent or Indian custodian is likely to result in serious emotional or physical damage to the children; (3) the State did not prove the likely serious emotional or physical damage to the children though the testimony of a "qualified expert;" (4) the juvenile court erred as a matter of law in relying upon pronouncements by the children's paternal grandmother (the current placement) that she would accept only "severance and adoption" and not guardianship as a remedy in this matter. This court will not substitute our opinion for that of the juvenile court unless the juvenile court's findings are clearly erroneous. *Pima Cnty. Dependency Action No. 93511*, 154 Ariz. 543, 545, 744 P.2d 455, 457 (App. 1987) (citation omitted).

> I. *The juvenile court did not err in finding ADES proved it made active efforts to maintain and restore the family unit.*

¶10 Mother contends ADES failed to make "active efforts" for reunification. We disagree. On appeal, Mother argues "active efforts," as

---

[6] The juvenile court found by clear and convincing evidence that Mother was unable to discharge her parental responsibilities under A.R.S. § 8-533(B)(3). This was the sole basis for terminating Mother's parental rights.

required by ICWA, require more than "reasonable efforts." Mother supports this contention by citing other jurisdictions that have found "active efforts" to be a higher standard than "reasonable efforts." Mother further asserts that ADES "did little more than make its 'usual' substance abuse referrals (*i.e.*, TERROS), and did little to nothing to find a competent inpatient treatment program for Mother." Despite Mother's contentions, the juvenile court specifically found on several occasions that ADES had made active efforts as required under ICWA, "including providing Mother detoxification programs, in-patient programs, and repeatedly offering aftercare substance abuse programs." On this record, we see no reason to further parse the meaning of "active efforts" when the juvenile court specifically found that ADES had met this standard in the present case.

¶11 The record demonstrates the juvenile court had ample evidence to substantiate its finding, including testimony from the CPS ICWA supervisor, the CPS caseworker, and Mother regarding Mother's failure to meaningfully participate in services and to maintain sobriety.

¶12 Mother alleges ADES failed to engage in active efforts when it failed to find her appropriate inpatient treatment, leaving it to the tribal caseworker to find the latest inpatient program for Mother. In this regard, the tribal caseworker testified that getting Mother admitted to the inpatient program on the reservation was due to the caseworker's "close connections" to that inpatient unit. The tribal caseworker's assistance in finding another inpatient program for Mother does not diminish ADES' active efforts to engage Mother in services, including ADES' scheduling of four separate intakes to another inpatient facility, all of which Mother failed to attend. *See Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 423, ¶ 34, 258 P.3d 233, 241 (App. 2011) (stating "neither ICWA nor Arizona law mandates that ADES provide every imaginable service or program designed to prevent the breakup of the Indian family before the court may find that 'active efforts' took place"). Accordingly, the juvenile court did not abuse its discretion when it found ADES had made active efforts at reunification as required under ICWA.

II.  *The juvenile court did not err in finding ADES proved beyond a reasonable doubt, through the testimony of a "qualified expert," that continued custody of the children by Mother is likely to result in serious emotional or physical damage to the children.*

¶13 Mother first argues ADES failed to provide sufficient foundation for the testimony of any expert; therefore, the opinion testimony of the various caseworkers, as described above, must be disregarded.

During the termination hearing, however, Mother did not object to any opinion testimony given by CPS' two caseworkers or the Tribe's caseworker. Accordingly, Mother has waived this issue on appeal. *See Estate of Reinen v. N. Arizona Orthopedics, Ltd.*, 198 Ariz. 283, 286, ¶ 9, 9 P.3d 314, 317 (2000) (stating "[a]n objection to proffered testimony must be made either prior to or at the time it is given, and failure to do so constitutes a waiver"). To the extent Mother argues the tribal caseworker and CPS caseworkers do not qualify as experts, we find that all three caseworkers qualify as expert witnesses as required under ICWA.

**¶14** An individual may qualify as an expert witness regardless of whether that individual has expertise with Indian children. *Rachelle S. v. Ariz. Dep't of Econ. Sec.*, 191 Ariz. 518, 520, ¶ 11, 958 P.2d 459, 461 (App. 1998). In an effort to assist state courts in interpreting ICWA, the United States Department of the Interior Bureau of Indian Affairs issued a set of guidelines. Guidelines for State Courts; Indian Child Custody Proceedings ("Guidelines"), 44 Fed. Reg. 67,584 (Dep't of Interior Nov. 26, 1979).[7] Arizona courts have previously relied on these Guidelines when interpreting sections of ICWA. *Rachelle S.*, 191 Ariz. at 520, ¶ 12, 958 P.2d at 461. Section D.4 entitled "Qualified Expert Witnesses" states in relevant part:

> (b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:
>> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
>> (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
>> (iii) A professional person having substantial education and experience in the area of his or her specialty.

Guidelines, 44 Fed. Reg. 67,584.

---

[7] The Guidelines have not been revised.

¶15 In the present case, the CPS ICWA caseworker had substantial education and experience to qualify as an expert witness under the Guidelines, including 20 years' experience with ADES, two of those as the ICWA unit supervisor, and a bachelor's and master's degree. Next, the CPS case manager had 18 months experience at CPS, managed over 20 ICWA cases, and had offered similar opinion testimony at three prior severance trials for ICWA cases. We find this experience, coupled with his bachelor's degree and then current enrollment in a master's degree program, qualified the CPS case manager as an expert witness. Last, the tribal caseworker qualified as an expert witness due to her membership in the children's tribe, the Gila River Indian Community.[8] The Tribe's caseworker's testimony fairly indicates that she is a member of the Tribe. Accordingly, even had Mother preserved an objection as to foundation, the juvenile court did not err when it considered the testimony of the CPS caseworker, the CPS ICWA supervisor, and the Tribe's caseworker, as each of these individuals constitutes a "qualified expert" under ICWA.[9]

¶16 Mother next contends the juvenile court's "single finding" that Mother's custody of the children would result in serious emotional or physical harm not only misstates the testimony of Tribe's caseworker, but also fails to establish proof of such potential harm beyond a reasonable doubt. Here, Mother's assertion is unfounded, as nothing in the record demonstrates the juvenile court *only* considered the testimony of the Tribe's caseworker. In addition, the juvenile court made several relevant findings that substantiate its ruling. First, the juvenile court stated "[t]he tribe opined that to return the children to Mother would cause a substantial risk of emotional or physical harm because Mother has a history of relapse." Next, the juvenile court expressly found "beyond a reasonable doubt that return of the children to Mother would likely [] cause both physical and emotional harm to the children."[10] Nothing in the record indicates that the juvenile court improperly or solely relied on the Tribe's caseworker's

---

[8] Mother did not contend at trial and does not argue on appeal that the Tribe's caseworker is not a member of the Tribe.

[9] All three caseworkers testified that returning custody of the children to Mother at the time of the hearing would place them at risk of serious emotional or physical harm.

[10] The juvenile court reasoned that Mother is a lifetime alcoholic who fails to maintain sobriety, despite numerous opportunities to do so. In addition, the juvenile court reiterated that Mother cannot provide the basic needs of the children, including food, clothing, and housing.

testimony. Mother's reliance on selected portions of this caseworker's testimony misstates the overall context of her testimony, as she ultimately agreed that Mother is not currently able to safely parent the children. It is clear from this record that the juvenile court acted well within its discretion in finding that the children would likely be harmed if returned to Mother's custody.

III. *The juvenile court did not rely upon pronouncements made by the children's paternal grandmother when it terminated Mother's parental rights.*

¶17        Mother contends the juvenile court relied on statements made by the children's paternal grandmother that she would not be willing to serve as the children's guardian and would agree to further participate only if the case plan was for adoption. In support of her argument, Mother cites the juvenile court's factual statement in its minute entry ruling that "[p]aternal grandmother does not wish to be the guardian of the children; however, she is willing to adopt the children." Despite Mother's assertion, we find nothing in the record that demonstrates the juvenile court relied on grandmother's statements in deciding to terminate Mother's parental rights; instead, the only relevant finding made with regard to placement states: "[t]he children are doing well in their current placement with Paternal Grandmother. They are flourishing in their current environment. The placement is also ICWA compliant." We find no error as this is an appropriate finding for the juvenile court to make during termination proceedings.

**CONCLUSION**

¶18        For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: gsh