NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

PATRICK G., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, H.G., SALT RIVER PIMA
MARICOPA INDIAN COMMUNITY, *Appellees.*

No. 1 CA-JV 17-0520
FILED 5-1-2018

Appeal from the Superior Court in Maricopa County
No.  JD30498, JS18878
The Honorable Cari A. Harrison, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge James B. Morse Jr. joined.

---

**J O N E S**, Judge:

**¶1**        Patrick G. (Father) appeals the juvenile court's order terminating his parental rights to H.G. (Child).  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        In May 2015, the Department of Child Safety (DCS) filed a petition alleging Child and her three half-siblings were dependent as to their mother (Mother) based upon grounds of neglect and substance abuse.[1] At the time, Father had approximately seven months left to serve of a 10.5-year prison term imposed following his plea of guilty to armed robbery and aggravated assault occurring in 2006 when Child was only five months' old. Because both Father and Child are enrolled members of the Salt River Pima-Maricopa Indian Community (the Community), the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901 to 1963,[2] applies to the severance proceedings.

**¶3**        Father, who had previously had no contact with Child, was encouraged to engage in whatever services were available to him in prison. In July 2015, the juvenile court authorized visits between Child and her paternal uncle (Uncle), also a Community member.  Uncle facilitated cultural activities for Child and telephone calls between Child and Father. Father was released on community supervision in September 2015 and began participating in urinalysis testing and supervised visitation.  After

---

[1]        We view the evidence in the light most favorable to upholding the juvenile court's order terminating parental rights.  *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 422, ¶ 27 (App. 2011) (citing *Maricopa Cty. Juv. Action No. JD-5312*, 178 Ariz. 372, 376 (App. 1994)).

[2]        Absent material changes from the relevant date, we cite a statute's current version.

Father demonstrated thirty days' sobriety, DCS referred Father for parent aide services. In January 2016, Child was placed with Uncle.

¶4        In late June 2016, Father began to feel overwhelmed, stopped participating in services, and ceased all contact with Child and DCS. Mother continued to comply with the case plan, however, and the dependency was dismissed in November 2016 after Child and her half-sister were returned to Mother's care.[3] The following month, DCS received reports of domestic violence and illegal drug use in Mother's home and, again, removed the children. Child and her half-sister were placed with their maternal grandmother (Grandmother). Child continued to visit Uncle on the Community reservation on weekends.

¶5        At the time, Mother reported Father was "on the run for violating probation." Indeed, the record shows Father had begun abusing alcohol and absconded from community supervision. He was eventually caught and reincarcerated in December 2016 but did not attempt to contact Child or DCS, and DCS did not learn of his reincarceration until March 2017.

¶6        Meanwhile, DCS filed a second dependency petition, and the juvenile court adopted a case plan of severance and adoption, noting that Father had failed to maintain an appropriate relationship with Child or demonstrate a sober and crime-free lifestyle. The court also permitted the Community to intervene. *See* 25 U.S.C. § 1911(c) (granting an Indian child's tribe the right to intervene in "any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child"). DCS promptly filed a petition to terminate the parent-child relationship. When Father was released in August 2017, he began weekly supervised visits with Child but did not participate in any other services through DCS or the criminal court.

¶7        At the contested dependency and severance trial in October 2017, the DCS caseworker testified Grandmother was meeting Child's needs and willing to adopt her. She reported visitation with Father was going fine, but that Child, only a few days shy of her twelfth birthday, did not want to live with Father because "he doesn't know her." Rather, Child wished to remain with her half-sister and would consent to an adoption by Grandmother.

---

[3]        Child's other two half-siblings were successfully reunified with their father in February 2016.

¶8 The DCS caseworker also testified that termination was in Child's best interests. Although Father had begun building a relationship with Child when she was first removed, that relationship was damaged when he violated his community supervision and disappeared for seven months without any explanation. Thus, the caseworker surmised Child would both be harmed through continuation of the unstable relationship, and benefitted by termination that would free her to live in a safe, stable, permanent, and drug- and alcohol-free home with Grandmother.

¶9 The Community case manager testified as an ICWA expert that DCS had made active efforts to preserve the Indian family, but they had been unsuccessful because Father had failed to engage in services or remedy his deficiencies. Therefore, the expert believed Child was at risk of serious emotional and physical injury if left in Father's care. The expert added that the Community supported Child's placement with Grandmother, who had been encouraging Child to maintain contact with Father's family.

¶10 Father testified he had absconded because "[i]t was too much," he was "overwhelmed," and he "didn't know how to be a dad." By the time of trial, however, Father had recently married, obtained employment as a landscaper, and signed a lease on an apartment large enough to afford Child her own room. He believed the parenting and anger management classes he completed in prison had remedied his negative behaviors such that he could meet Child's needs. It had never occurred to Father to tell DCS about his new wife, and the juvenile court later took judicial notice of a pending family court action that revealed Child's new stepmother had abandoned her own four children, failed to participate in reunification therapy, and was facing termination of her parenting time. Father said he was unaware of the family court case and did not know if his wife or her children would act appropriately around Child.

¶11 After taking the matter under advisement, the juvenile court found that Child was dependent as to Father and that termination of his parental rights was warranted upon grounds of abandonment. The court also found that DCS had made active efforts to provide rehabilitative services to Father, those efforts had been unsuccessful, and Father's continued custody of Child would likely cause Child serious emotional or physical damage. The court then terminated Father's parental rights to

4

Child.[4]   Father timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1), and Arizona Rule of Procedure for the Juvenile Court 103(A).

## DISCUSSION

¶12        Generally, the juvenile court may terminate a person's parental rights if it finds that a statutory ground exists and termination is in the child's best interests.  *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334, ¶ 9 (2009) (citing A.R.S. §§ 8-533(B), -537(B), and *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005)).  When the child is an Indian child, ICWA requires two additional findings.  First, the court must find by clear and convincing evidence that active efforts at "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" were made and were unsuccessful.  25 U.S.C. § 1912(d); *Yvonne L.*, 227 Ariz. at 421, ¶ 26 (App. 2011) (holding "the necessary ICWA 'active efforts' finding must . . . be made under the clear and convincing evidence standard").  Second, the court must make "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."  25 U.S.C. § 1912(f).

¶13        Father does not contest the sufficiency of the evidence to sustain the juvenile court's findings on the grounds for severance or Child's best interests, arguing only that insufficient evidence supports the court's ICWA findings.  We review ICWA findings for an abuse of discretion and will affirm so long as the record contains substantial evidence to support them.  *See Yvonne L.*, 227 Ariz. at 422, ¶ 27 (citing *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 2 (App. 1998)).

## I.      Unsuccessful Active Efforts

¶14        Father argues DCS failed to make active efforts to preserve the Indian family by failing to provide services or take action to strengthen his bond with Child while he was incarcerated.[5]  Specifically, Father

---

[4]      The juvenile court also terminated Mother's parental rights to Child. Mother did not appeal that determination and is not a party to this action.

[5]      DCS argues Father waived this argument by not raising the issue with the juvenile court.  Although a parent may waive his objection to the

contends DCS was required to provide visitation with Child while he was in prison.

**¶15**        In Arizona, "[w]hat constitutes 'active efforts' will vary, depending on the circumstances, the asserted grounds for severance and available resources."[6] *S.S. v. Stephanie H.*, 241 Ariz. 419, 425, ¶ 21 (App. 2017) (citations omitted). "Neither ICWA nor Arizona law mandates that [DCS] provide every imaginable service or program designed to prevent the breakup of the Indian family before the court may find that 'active efforts' took place." *Yvonne L.*, 227 Ariz. at 423, ¶ 34. In an abandonment proceeding, "active efforts" include initiatives "aimed at promoting contact by a parent with the child and encouraging that parent to embrace his or her responsibility to support and supervise the child." *Stephanie H.*, 241 Ariz. at 425, ¶ 22 (citing *In re C.A.V.*, 787 N.W.2d 96, 103 (Iowa App. 2010)).

**¶16**        The record reflects that DCS encouraged Father to participate in whatever services were available to him in prison. DCS placed Child with Uncle and then Grandmother, both of whom demonstrated a commitment to maintaining Child's connection to Father and Father's family. While incarcerated, Father participated in telephone calls with Child; he was then referred for weekly visitation once he was released and established his sobriety. DCS also referred Father for substance abuse testing and treatment and parent aide services to assist him in proving he was capable of providing a safe and stable home for Child. As a result of these efforts, Father was making progress in his relationship with Child, with whom he had otherwise had no contact for over a decade. Rather than take advantage of these services, Father absconded from his community

---

nature and extent of reunification services required by state statute, *see Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79, ¶¶ 16-18 (App. 2014), DCS cites no authority suggesting a parent can waive an objection to the nature and extent of reunification efforts separately required by ICWA, and we find none. Moreover, given the fundamental nature of Father's interest in the custody of his child, *see Christy A. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 299, 306, ¶ 22 (App. 2007) (citing *Mara M. v. Ariz. Dep't of Econ. Sec.*, 201 Ariz. 503, 507, ¶ 24 (App. 2002)), we choose to address the merits of Father's argument.

[6]      Although Father contends the "active efforts" ICWA requires are "far more than simply 'reasonable' efforts" required under state law, he cites no Arizona authority to support that position; nor does he identify what additional services, if any, would have facilitated his relationship with Child.

supervision and ceased all contact with Child because he did not know "how to be a dad." Nonetheless, during his second incarceration, Father in fact completed parenting and anger management classes and DCS re-referred Father for the same services upon his release.

¶17         The juvenile court considered the efforts made to preserve Child's family and found on five separate occasions between May 2016 and October 2017 that they were "active efforts." On appeal, we "do not reweigh the evidence concerning the diligence exerted in attempting to preserve the family," *Yvonne L.*, 227 Ariz. at 422, ¶ 27 (citing *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 81, ¶ 13 (App. 2005)), because the juvenile court is in the "best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings," *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002) (citing *Pima Cty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987)). Moreover, we decline to hold DCS responsible for delays and interruptions in services occasioned by Father's decisions to quit participating in services, use alcohol, and abscond from supervision. *See Yvonne L.*, 227 Ariz. at 423 n.18, ¶ 34; *see also A.A. v. State*, 982 P.2d 256, 261 (Alaska 1999) (explaining that a "parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement"). We further decline to adopt a rule requiring DCS to provide in-person prison visits under all circumstances, particularly here, where Father had not had contact with Child since she was an infant nearly ten years earlier and had no existing relationship. Substantial evidence supports the finding that active efforts were made to prevent the breakup of the Indian family, and we find no error.

¶18         Father also argues DCS failed to prove the efforts were unsuccessful because he was rebuilding a bond with Child at the time of trial. Evidence of progress is not, however, evidence of success; Child reported to both the DCS caseworker and ICWA expert that Father "did not know her." Moreover, Father fails to account for the seven months he absconded from his budding relationship with Child to abuse alcohol and avoid the obligations of community supervision. Father's lack of participation in substance abuse testing and treatment and parent aide services prevented him from establishing or maintaining a parental relationship with Child. These circumstances support the juvenile court's finding that the efforts to preserve the family were unsuccessful.

## II.     Risk of Physical or Emotional Harm

¶19     "A determination that an Indian child will likely suffer serious harm if returned to the custody of the parent[] requires clear and convincing evidence 'both that the parent's conduct is likely to harm the child and that the parent is unlikely to change [his] conduct.'" *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 571-72, ¶ 21 (2008) (quoting *E.A. v. State*, 46 P.3d 986, 992 (Alaska 2002), and citing *Thomas H. v. State*, 184 P.3d 9, 19 (Alaska 2008)).  The juvenile court must consider expert testimony that addresses this issue, but "that expert testimony need not parrot the language of the statute," *id.* at 572-73, ¶¶ 21, 29, and need not provide the sole basis for the court's conclusion, *Brenda O. v. Ariz. Dep't of Econ. Sec.*, 226 Ariz. 137, 142, ¶ 23 (App. 2010) (quoting *E.A.*, 46 P.3d at 992).

¶20     Father argues the ICWA expert's "unsupported conclusion, standing alone, cannot constitute 'proof beyond a reasonable doubt.'"  But the expert's conclusion was not unsupported.  The expert testified he was familiar with the facts of the case because, as the Community case manager, he was "in fairly constant communication with [DCS]," had monthly contact with Child, and reviewed all of the parties' disclosures.  Nor did his conclusion stand alone.   His opinion is supported by Father's non-compliance with services, Father's decisions to abscond from community supervision and engage in alcohol abuse when the stress of learning how to parent overwhelmed him, and Father's failure to appreciate the detrimental effect of his conduct upon his relationship with Child.  The expert's opinion is further supported by the DCS caseworker's testimony that Child would be harmed if she were removed from Grandmother's safe, stable home and separated from her half-sister, only to have Father repeat his pattern of abandoning her when he relapsed on alcohol or felt overwhelmed by the day-to-day activities of parenting (which he had yet to undertake).  In this way, the present case is distinguishable from *Alma S. v. DCS*, 778 Ariz. Adv. Rep. 24, *4, ¶ 19 (App. 2017) (rejecting the testimony and conclusions of witnesses whose opinions were "not sufficiently rooted in the evidence").

¶21     Father also argues DCS failed to prove he posed a risk of emotional or physical damage to the child because "there is no evidence that Father physically or emotionally abused [Child] at any time in her past."  ICWA does not, however, require proof of abuse; rather, the juvenile court must find the child is likely to suffer from physical or emotional damage as a result of a parent's overall conduct if the child were returned to his care.  The record contains sufficient evidence upon which the court

could conclude beyond a reasonable doubt that Child was likely to suffer harm if placed in Father's care. *See supra* ¶ 20. We find no error.

### III. Father's Credibility

**¶22** Father argues the juvenile court erred in determining he was not credible in his testimony regarding his financial circumstances. He argues that the record does not support this finding and that such a significant error warrants a new trial. The court committed no error.

**¶23** Father testified that he had provided financial support to Child while he was in prison by redirecting a per capita payment he received from the Community to Child's placements. But the juvenile court found that no evidence supported Father's claim, that Father never reported the information to DCS, and that Father's receipt of this income was generally inconsistent with the court's appointment of an attorney to represent him. After considering the circumstances, the court concluded it "d[id] not find this testimony credible *so as to rebut the abandonment otherwise presented*." (Emphasis added).

**¶24** The State rightfully concedes that the record does not support any finding that Father "was not honest . . . regarding his ability to pay for an attorney" because Father never completed a financial affidavit for that purpose. But the juvenile court's credibility determination did not, as Father suggests, "significantly impact[] the trial court's ruling in this matter." By its terms, the court's credibility determination affected only the conclusion that Father failed to rebut the presumption of abandonment created by his failure to maintain a normal parental relationship with Child for six months or longer. *See* A.R.S. § 8-531(A) ("Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes *prima facie* evidence of abandonment."). Because Father does not contest the abandonment finding, any error was harmless.

**CONCLUSION**

¶25        The juvenile court's orders are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA