CAMPBELL, J., specially concurring:
¶22 While federal law requires me to agree with the majority opinion, I do so under protest. This is a clear case of form over substance-compliance with ICWA has usurped the best interest of this child and the rights of his biological Mother. There is no dispute that the Guardian Ad Litem, Mother, and the foster placement supported the proposed guardianship. Neither DCS nor the Navajo Nation actively supported or objected to the guardianship. At the time of the hearing, the child had been with the proposed guardian for more than three years.
¶23 One might ask-what then is the problem? The only issue with the guardianship is the absence of testimony from a Qualified Indian Child Welfare Expert Witness ("QEW"). Under ICWA, a QEW must testify that the continued custody of the child with the parent or Indian custodian will likely result in emotional or physical harm to the child before it can deviate from the ICWA placement preferences. 25 U.S.C. § 1912(e) ; see supra ¶¶ 12-14. The juvenile court made this finding on two prior occasions, confirming that remaining with the proposed guardian (the foster placement) was in the child's best interests. In the meantime, there had been no change in Mother's circumstances-she was still in prison. Continued custody of the child by Mother remained impossible.
¶24 There being no change in Mother's circumstance, the need for QEW testimony was simply a formality. The Navajo Nation refused to provide a QEW, even though Native American tribes are the main resource in the BIA Guidelines identified to assist in locating QEWs. U.S. Department of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act 54 (Dec. 2016) ("The rule encourages ... any party to request the assistance of the Indian child's Tribe or the BIA office serving the Indian child's Tribe in locating persons qualified to serve as expert witnesses.").[3] DCS also refused to help Mother after the Department's only QEW in Maricopa County refused to provide testimony. Her refusal was based in part on her opinion that the child should be placed with a member of the Navajo Nation. By refusing to provide the required testimony, the QEW's absence-and the scarcity of alternative QEWs-acted as a de facto veto of the judicial decision without due process of law.
¶25 After the Navajo Nation and DCS refused to provide a QEW, Mother's attorney began searching for one. Ten days before the hearing, she located an attorney who had previously provided QEW testimony for the Shoshone-Bannock Tribe. The Navajo Nation objected, asserting this expert lacked adequate cultural knowledge and understanding of the Navajo people. Based on the Navajo Nation's objection, the court determined the witness did not qualify as a Navajo QEW.
¶26 The majority holds the court committed error by granting the guardianship without QEW testimony. While the law requires that result, it is not in the child's best interests *989 nor does it give any weight to Mother's constitutionally guaranteed parental rights. See Santosky v. Kramer , 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."); Trisha A. v. Dep't of Child Safety , 245 Ariz. 24, 29-30, ¶ 12, 424 P.3d 425, 430-31 (App. 2018) (review granted Feb. 5, 2019). The child had been in the same foster placement for more than three years and the court already found that moving him to Mother (an impossibility) or a Navajo placement would be detrimental to his well-being. Moreover, although Mother's parental rights are intact, her preference for guardianship placement is cast aside-not because of the Navajo Nation's objection to the guardianship, but because of its protection of QEW status and the procedural requirements set forth in ICWA.
¶27 In this instance, ICWA frustrates the general purpose of a dependency proceeding. The juvenile court's mandate is to resolve the matter consistent with the best interests of the child. See Ariz. Dept. of Econ. Sec. v. Super. Ct., 178 Ariz. 236, 239, 871 P.2d 1172, 1175 (App. 1994) ("The primary consideration in a dependency case is always the best interest of the child."); see also Pima Cty. Juv. Action No. J-31853, 18 Ariz. App. 219, 220, 501 P.2d 395 (1972) ("The welfare of the child is the prime consideration of a juvenile code."). Here, there was nothing that needed to be resolved through QEW testimony: all parties conceded that Mother could not parent the child from prison and attempts to place the child within the tribal community had proven detrimental. See 25 U.S.C. § 1912(e) ; supra ¶¶ 12-14. In this case, strict compliance with ICWA undermined the goals of the entire dependency process and failed to serve the best interests of this child and the rights of this Mother.

Arizona courts have previously relied on BIA Guidelines. Brenda O. v. Ariz. Dep't of Econ. Sec. , 226 Ariz. 137, 140, ¶ 14, 244 P.3d 574, 577 (App. 2010) ; Rachelle S. v. Ariz. Dep't of Econ. Sec. , 191 Ariz. 518, 520, ¶ 12, 958 P.2d 459, 461 (App. 1998) ; see also Matter of M.E.M. , 195 Mont. 329, 635 P.2d 1313, 1320 (1981) (directing the district court on remand to consider the BIA Guidelines).