828 P.2d 1245

**In the Matter of the Appeal in MAR-
ICOPA COUNTY JUVENILE
ACTION NO. JS–8287.**

**No. 1 CA–JV 90–011.**

Court of Appeals of Arizona,
Division 1, Department B.

Nov. 29, 1991.

As Amended Dec. 6, 1991.

Review Denied May 5, 1992.

Rosenfelt, Barlow & Borg, P.A. by Scott E. Borg, Albuquerque, for appellant Pueblo of Santo Domingo.

Friedl, Richter & Buri by Charles E. Buri, Phoenix, for appellant Biological Mother.

Grant Woods, Atty. Gen. by C. Eileen Bond, Asst. Atty. Gen., Phoenix, for appellee Arizona Dept. of Economic Sec.

Hendrickson & Fuller by Richard T. Fuller, Mesa, for appellee Juvenile.

## OPINION

EHRLICH, Judge.

The Pueblo of Santo Domingo and K.J.R.,[1] the biological mother of the child of concern in this action and a Pueblo member, appeal from a trial court order terminating K.J.R.'s parental rights. We affirm the order.

### FACTS AND PROCEDURAL HISTORY

The child was born on January 28, 1987, in Phoenix. On March 6, 1987, the Arizona Department of Economic Security (DES) filed a dependency petition, primarily alleging that although K.J.R. acknowledged a serious alcohol problem, she had not accepted her inability to consume alcohol and had not consistently participated in sufficient treatment. K.J.R. then disappeared with the child for over three months. However, in June 1987, K.J.R. was jailed for assault and on an outstanding warrant for marijuana possession. By then, K.J.R. had left the child for an undetermined period of time with a friend, who unsuccessfully had tried to sell the child for $25.00. On June 24, 1987, the child was placed in foster care off the reservation where she continues to reside. The Pueblo received notice of a dependency proceeding in July 1987. On July 28, 1987, the child was found to be dependent and made a ward of the court in an uncontested proceeding at which neither the Pueblo nor K.J.R. appeared.

On April 7, 1989, after repeated unsuccessful efforts to provide K.J.R. with services to improve her parenting skills, DES petitioned the trial court for termination of K.J.R.'s parental rights as to three of her five children, including the child in this action. The petition also requested the termination of the parental rights of two named alleged fathers of the child and any other man claiming paternity. DES alleged in the petition that despite its diligent efforts, K.J.R. was unable to be a parent to the child due to mental illness and/or chronic alcohol or substance abuse. The petition also alleged that any man claiming paternity had abandoned the child.

On June 16, 1989, the Pueblo was notified of the hearing on the termination petition scheduled for June 26, 1989, and it later was notified of its right to intervene and/or petition the trial court for transfer of the matter to tribal court. Attached to the second notice was DES' termination social study which stated that the Foster Care Review Board's plan for the child had changed from returning the child to her mother to severance and adoption. The termination hearing was continued because the Pueblo had indicated that it was considering intervening or petitioning for transfer of the matter to tribal court.

At the time set for the termination hearing on July 17, 1989, the trial court granted the Pueblo's motion to intervene and a DES motion to amend its termination petition. A DES caseworker informed the court that the Pueblo still was considering petitioning for transfer to tribal court and the hearing again was continued. At the time of a

---

1. The initials of the biological mother have been used to protect her privacy.

pretrial conference on September 20, 1989, the Pueblo still had not filed a transfer petition and the court again continued the hearing, allowing the Pueblo until November 15, 1989, to file a petition. On October 30, 1989, the trial court held an uncontested severance hearing as to the child's alleged fathers. The court found beyond a reasonable doubt that the two men named had abandoned the child and terminated their parental relationship.

On November 14, 1989, the Pueblo filed a petition to transfer termination proceedings for three of K.J.R.'s children, including the child in this matter, claiming that "[t]here is no justifiable reason to deny Santo Domingo's assumption of jurisdiction over this proceeding." DES objected to a transfer regarding the child in this matter, stating that "the child is fully bonded with the foster family and the foster family has indicated a serious intent in adopting the child." The children also objected to the transfer petition. Later, K.J.R. joined the Pueblo's petition. The trial court granted the petition as to K.J.R.'s two other children, but found good cause to deny the transfer petition for the child in this action.

> The Court finds that proceedings concerning [the child] have been pending in this Court since as early as March 6, 1987, of which the Pueblo of Santo Domingo had notice. [The child] has been in foster care under the auspices of this Court for nearly three years, yet the Pueblo of Santo Domingo appears not to have taken any action in the case until November 15, 1989. In the meantime, [the child] has bonded with the foster family. Transfer of the case at this late date would result in the sudden interruption of this care. This is contrary to [the child's] best interest.

On March 7, 1990, the trial court held a termination hearing as to K.J.R.. During the hearing, the Pueblo moved for reconsideration of the denial of its transfer petition

as did K.J.R. She conceded, however, that the Pueblo's transfer request "should have been done at the time of [the child's] birth or the summer of 1987 ... [w]hen she was first taken into custody by" DES. After taking both matters under advisement, the court affirmed its earlier denial of the Pueblo's transfer petition and terminated K.J.R.'s parental rights. The Pueblo and K.J.R. appealed from the termination order, raising the issues of whether the trial court erred in denying the Pueblo's petition to transfer the case to tribal court and whether the trial court's termination of K.J.R.'s parental rights is supported by the evidence and law.

## DISCUSSION

The Indian Child Welfare Act of 1978 (hereinafter "the Act"), 25 U.S.C. 1901 *et seq.* (1983), resulted from concern over the increasing number of Indian children placed in non-Indian foster or adoptive homes. It declared:

> [I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, ...

25 U.S.C. 1902; *see* H.R.Rep. No. 1386, 95th Cong., 2d Sess. 8, 9, reprinted in (1978) *U.S.Code Cong. & Admin.News* 7530, 7531 (hereinafter "H.R.Rep. 1386"). The Act specifically applies to child custody proceedings[2] involving Indian children.[3] *See Matter of Appeal in Maricopa County Juvenile Action No. A–25525*, 136 Ariz. 528, 531, 667 P.2d 228, 231 (App.1983).

### A. *Jurisdiction*

■ At the "heart" of the Act are "its provisions concerning jurisdiction over Indi-

---

**2.** A "'child custody proceeding' shall mean and include—... 'termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship." 25 U.S.C. 1903(1)(ii).

**3.** "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. 1903(4).

an child custody proceedings." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29 (1989). Once a trial court determines that the Act applies to a particular Indian child custody proceeding, the court then must decide the appropriate forum. The Act provides for exclusive tribal jurisdiction in an Indian child custody matter if the Indian child "resides or is domiciled within the reservation" or is a ward of tribal court. 25 U.S.C. 1911(a). However,

> [i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, *in the absence of good cause to the contrary,* shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe.

25 U.S.C. 1911(b) (first emphasis added). This essentially is concurrent jurisdiction with a preference for tribal court jurisdiction that can be overcome on a showing of good cause. *In re Robert T.,* 200 Cal. App.3d 657, 246 Cal.Rptr. 168, 171–72 (1988). The Act does not deprive a state of its traditional jurisdiction over an Indian child within its venue; it establishes "minimum federal standards and procedural safeguards designed to protect the rights of the child as an Indian and the integrity of the Indian family." Manuel P. Guerrero, "Indian Child Welfare Act of 1978: A Response to the Threat to Indian Culture Caused by Foster and Adoptive Placements of Indian Children," 7 *Am.Indian L.Rev.* 51, 75 (1979).

Because the Act does not define "good cause to the contrary," a state court has discretion whether to transfer a matter to tribal court or retain jurisdiction. Russel

Barsh, "The Indian Child Welfare Act of 1978: A Critical Analysis," 31 *Hastings L.J.* 1287, 1317–18 (1980);[4] *see Matter of T.S.,* 245 Mont. 242, 801 P.2d 77, 80 (1990) (courts deciding Indian child custody matters primarily responsible for interpreting the Act) (citing 44 Fed.Reg. at 67,584 (1979)), *cert. denied,* — U.S. ——, 111 S.Ct. 2013, 114 L.Ed.2d 100 (1991); *Chester County Dep't of Social Services v. Coleman,* 296 S.C. 355, 372 S.E.2d 912, 914 (App.1988) (state courts have flexibility to determine disposition of Indian child placement proceeding, citing H.R.Rep. 1386); *Matter of Wayne R.N.,* 107 N.M. 341, 757 P.2d 1333, 1335 (App.1988) (good cause determination made on case-by-case basis after careful consideration of all circumstances). On appeal, we will not upset a trial court's ruling absent an abuse of its discretion. *State v. Veatch,* 132 Ariz. 394, 396, 646 P.2d 279, 281 (1982). Only a finding of fact not based on any evidence is arbitrary and an abuse of discretion. *United Imports and Exports, Inc. v. Superior Court,* 134 Ariz. 43, 46, 653 P.2d 691, 694 (1982).

The legislative history of § 1911(b) provides that the Act's good-cause exception allows state courts to apply a modified version of *forum non conveniens* when deciding whether to retain or transfer jurisdiction in Indian child custody proceedings. *Matter of Appeal in Pima County Juvenile Action No. S–903,* 130 Ariz. 202, 206, 635 P.2d 187, 191 (App.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); H.R.Rep. 1386 at 21. The traditional doctrine of *forum non conveniens* gives a court discretion to forego jurisdiction. *E.g., Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed. 1067 (1947). *See* Note, "Indian Child Welfare: A Jurisdictional Approach" (hereinafter "Indian Child Welfare"), 21 *Ariz.L.Rev.* 1123, 1142 (1979).

---

4. In his law review article, Barsh maintains that if the Act intended to remove decisions regarding the placement of Indian children from state court judges who ostensibly often failed to appreciate the Indian culture, it nonetheless

"places the remedy, transfer to tribal courts, in the virtually unlimited discretion of state judges." Barsh, "The Indian Child Welfare Act of 1978: A Critical Analysis," 31 *Hastings L.J.* 1287, 1318 (1980).

In such cases, the court considers "relative ease of access to sources of proof; availability of compulsory process," and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp.*, 330 U.S. at 508, 67 S.Ct. at 843. The traditional doctrine is modified in the sense that it allows state courts to retain rather than transfer jurisdiction if the tribal court is an inconvenient forum. "Indian Child Welfare," 21 *Ariz.L.Rev.* at 1142. Necessarily, the rights of the Indian child and the tribe are considered, but a court's accessibility to proof of a parent's unfitness is a principal factor on which a state court may decide to retain jurisdiction. *Id.* at 1142–43. It was so analyzed by the New Mexico Court of Appeals which affirmed a trial court's finding of good cause and refusal to transfer an Indian child custody proceeding. *Matter of Wayne R.N.*, 757 P.2d at 1336.

For assistance in interpreting the Act, including whether to transfer a child custody matter, the court may rely on the Act's interpretive guidelines, drafted by the Bureau of Indian Affairs (BIA). "Guidelines for State Courts; Indian Child Custody Proceedings," 44 Fed.Reg. 67,584 (1979). Although the guidelines were not published as regulations because they were not intended to have binding legislative effect, *id.*, they have been relied on by Arizona courts. *See Juvenile Action No. A–25525*, 136 Ariz. at 532 n. 4, 667 P.2d at 232 n. 4; *Juvenile Action No. S–903*, 130 Ariz. at 206, 635 P.2d at 191. The guidelines for determining whether good cause exists to deny a petition to transfer a custody matter to tribal court provide in relevant part:

C.3. Determination of Good Cause to the Contrary.

\* \* \* \* \* \*

(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

\* \* \* \* \* \*

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

\* \* \* \* \* \*

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered.

44 Fed.Reg. at 67,591.

If the court or any party asserts that good cause exists, the guidelines further provide that the reasons must be in writing and made available to the petitioner and that the petitioner as well as each other party shall have an opportunity to express views on good cause. *Id.* at 67,590–91; *cf. Matter of G.L.O.C.*, 205 Mont. 352, 668 P.2d 235, 236 (Mont.1983) (trial court must conduct jurisdictional hearing before ruling on transfer petition). The party opposing the petition has the burden of establishing good cause to deny transfer of the matter to tribal court. 44 Fed.Reg. at 67,591.

On appeal, K.J.R. and the Pueblo argue that the trial court erred when it denied the Pueblo's motion to transfer the matter to tribal court because DES, the party opposing the transfer, did not meet its burden of establishing good cause to the contrary. They maintain that the Pueblo timely filed the transfer petition because it did so within the time granted by the state court. The Pueblo contends that the delay was not unreasonable because the state court granted the Pueblo's petition as to two of the three children and that characterizing the petition as untimely undercuts the strong federal policy favoring tribal court jurisdiction over dismantling an Indian family in state court. It also asserts that it did not petition for transfer earlier because the original plan provided for the mother's rehabilitation and eventual reunion with the child.

DES responds that the trial court properly denied transfer to the tribal court because good cause exists due to both the tribal delay in requesting the transfer and the fact that the evidence necessary to

decide the case could not be presented in tribal court without undue hardship.

It is undisputed that the matter at issue is an Indian child custody proceeding and that K.J.R. is an enrolled member of the Pueblo, bringing this case within the purview of the Act. *See Juvenile Action No. A–25525*, 136 Ariz. at 532, 667 P.2d at 232. The Pueblo petitioned the trial court for transfer of the severance proceeding and neither did the tribal court decline jurisdiction nor did K.J.R. object to the transfer. 25 U.S.C. 1911(b). However, after allowing the parties an opportunity to express their opinions regarding transfer of the termination proceeding to tribal court, the trial court found good cause to deny the transfer petition. It observed that while the child was in foster care under the auspices of the court for years, the Pueblo did not take any action despite notice to it. The court concluded that given the passage of time and the child's attachment to her foster family, it was in the child's best interest not to separate her from this family. "Furthermore, the legitimate interests of the Pueblo can be protected by its participation in the Maricopa County proceedings, the Court having granted the Motion to Intervene." After providing K.J.R. with an additional opportunity to argue why good cause did not exist, the court reconsidered its transfer decision and affirmed the petition's denial.

The Act permits the denial of a transfer petition for good cause. 25 U.S.C. 1911(b). Subsection b(i) of the BIA guidelines provides that good cause to deny transfer exists if the child custody proceeding is at an advanced stage when the transfer petition is filed and the petition was not promptly filed after notice of the child custody proceeding. 44 Fed.Reg. at 67,591; *see Matter of Wayne R.N.*, 757 P.2d at 1336 (transfer petition filed six months after notice of termination proceeding weighed against transfer).

The record shows that the state first became involved with the child on March 6, 1987, when DES filed a dependency petition. The Pueblo admits that it was notified of the dependency proceeding and did not take action. The child was made a ward of the state court without an appearance or objection by the Pueblo. DES subsequently petitioned for termination of K.J.R.'s parental rights, of which the Pueblo was timely notified. The Pueblo did not move to intervene until July 13, 1989, two years after the child had been placed in off-reservation foster care, and it did not petition for transfer of the matter until November 14, 1989. DES objected to the transfer petition, stating that good cause existed to deny the petition because while the Pueblo was considering intervention and transfer, the child was strengthening the bond with the foster parents who now wanted to adopt her.

The California Court of Appeals was faced with a similar situation in *In re Robert T.* in which the Santo Domingo Pueblo petitioned the state trial court for transfer of termination proceedings to its tribal court. 246 Cal.Rptr. 168. The Pueblo had been notified of dependency proceedings involving the Indian child in July 1983 and of subsequent termination proceedings in November 1984, but it did not move to intervene until February 1985 and did not file a transfer petition until April 1985. *Id.* at 172.

The trial court determined that the Pueblo's five-month delay between receiving notice of the termination hearing and filing the transfer petition constituted good cause to deny the petition. *Id.* The appellate court affirmed the trial court, but found the Pueblo's lack of cause more pronounced than had the trial court because the Pueblo had been notified of all hearings relating to the child's dependency since July 1983 and had not expressed an intent to be involved until February 1985. *Id.* at 172, 173. The appellate court further observed that between the time when the Pueblo first was notified of proceedings and when it requested transfer, the child had "bonded to his foster-adoptive family" and the state had begun permanency planning. *Id.* at 173. The court said:

the tribe cannot reasonably delay its request for transfer until after the child's adoptive family has been found. We

therefore hold that the 16–month delay between the permanency planning hearing ... and the tribe's first expression of intent to intervene ... was sufficient to establish "good cause" under the Act and the guidelines for the court to deny the transfer petition.

*Id.* at 174.

■ Likewise, in this case, the Pueblo had been notified of all proceedings concerning the child's dependency, yet it waited for over two years to petition for transfer, during which time the child had bonded to her foster-adoptive family and planning for the child's adoption had begun. The record does not indicate that the Pueblo was unable to file a transfer petition earlier. On the contrary, the record reveals that the Pueblo was aware of the dependency, severance and adoption plan and had been considering filing a petition for some time. The evidence sufficiently supports the court's conclusion that the proceedings were at an advanced stage when the Pueblo petitioned for transfer and that the petition, although filed just before the court's deadline,[5] nonetheless was not filed promptly after receiving notice of the proceedings. The court did not abuse its discretion when it denied the petition and we will not reverse its decision.[6]

■ Despite the fact that the trial court's finding of delay was sufficient to justify its denial of the transfer petition, the court also denied the Pueblo's petition because transfer to tribal court was not in the child's best interest. A trial court properly may consider an Indian child's best interest when deciding whether to transfer a custody proceeding to tribal court. *See* 25 U.S.C. 1902; *Matter of N.L.,* 754 P.2d 863, 869 (Okla.1988) (citing *Matter of M.E.M.,* 195 Mont. 329, 635 P.2d 1313, 1317 (1981)). The record supports the court's denial on this basis because the

child had resided with her foster-adoptive parents since she was five months old and she had formed a bond with the only parental figures she had known. The record further reveals that this was the most stable environment the child had experienced and that transfer to an out-of-state tribal court would be disruptive to her and not in her best interest.

■ Although not addressed by the trial court, subsection b(iii) of the BIA guidelines additionally provides that good cause exists when the evidence necessary to decide the case could not be adequately presented in tribal court without undue hardship to the parties or witnesses. This criterion reflects the Act's legislative history that trial courts are permitted to apply a modified doctrine of *forum non conveniens* when deciding where a child custody matter should be heard. *See In re Robert T.,* 246 Cal.Rptr. at 174. The record reveals that the tribal court in this case is an inconvenient forum because the child, K.J.R. and all of the witnesses who testified at the severance hearing, except for the tribal social worker, reside in Phoenix. K.J.R.'s social history is found in Phoenix also. Therefore, if the termination proceeding were held in an out-of-state tribal court, the evidence concerning K.J.R.'s fitness as a parent could not be adequately presented without creating an undue hardship on the parties and all but one of the witnesses. *Cf. Juvenile Action No. S–903,* 130 Ariz. at 207, 635 P.2d at 192 (transfer to tribal court because evidence concerning parental fitness more accessible in Montana than Arizona). Therefore, we find that the court also could have denied the Pueblo's transfer petition for this reason. *E.g., Board of Regents v. Public Safety Retirement Fund Manager,* 160 Ariz. 150, 154, 771 P.2d 880, 884 (App.1989) (trial court's decision upheld on review if correct

---

5. The trial court noted in a minute entry of December 5, 1989, that the parties had agreed upon a deadline of November 15, 1989 for the filing of a transfer petition. However, the court also said that "[t]his was not a stipulation that the Petition should be granted, but only that the Pueblo would not even seek transfer after November 15, 1989."

6. While we realize that the court granted the Pueblo's transfer petition as to two of the three children, this appeal is limited to one child with circumstances quite different from her two siblings.

for any reason); *University Mechanical Contractors of Arizona, Inc. v. Puritan Insurance Co.*, 150 Ariz. 299, 301, 723 P.2d 648, 650 (1986) (same).

Finally, the trial court found that despite its denial of the transfer petition, the Pueblo's interests would be protected in a state court termination proceeding because the court previously had granted its motion to intervene. This court has held that

> [e]ven if the state court retains jurisdiction, the tribe is protected against the possibility of state court bias against tribal culture as it may intervene at any point in the custody proceeding ... and the parent-child relationship can be terminated only by a showing of parental unfitness beyond a reasonable doubt.

*Juvenile Action No. S–903,* 130 Ariz. at 204, 635 P.2d at 189; *see also Matter of Wayne R.N.,* 757 P.2d at 1336 (tribal representatives at state-court termination hearing protected tribes' rights). At the termination hearing, the Pueblo took no position on the merits of the case. We are confident on this record that the Pueblo's values were recognized during the parental termination proceedings but that good cause supported the trial court's retention of jurisdiction.

### B. *Termination of Parental Rights*

K.J.R. argues that contrary to the Act's requirements, the trial court erroneously terminated her parental rights without hearing testimony from a qualified expert witness that her continued custody of the child was likely to result in serious emotional or physical damage to the child. She also asserts that the grounds for terminating the parent-child relationship were not proven beyond a reasonable doubt.

Upon review, we "accept the juvenile court's findings of fact in support of severing the parent-child relationship unless they are clearly erroneous. Furthermore, the juvenile court will be deemed to have made every finding necessary to support the judgment." *Matter of Appeal in Pima County Severance Action No. S–1607,* 147 Ariz. 237, 238, 709 P.2d 871, 872 (1985) (citations omitted); *see Appeal in Yavapai County Juvenile Action No. J–*

*9956,* 818 P.2d 163 (App.1991) (citation omitted).

Before involuntarily terminating the rights of a parent of an Indian child, the Act requires a court to consider the testimony of a qualified expert witness as to whether the parent's continued custody threatens the child's physical or emotional well-being. 25 U.S.C. 1912(f). Although the qualifications of such an expert are not defined by the Act, the BIA's guidelines are instructive, suggesting that "[a] professional person having substantial education and experience in the area of his or her specialty" likely will qualify as an expert witness. 44 Fed.Reg. at 67,593. The guidelines explain that the party offering the expert witness must demonstrate that the witness is qualified by reason of educational background and prior experience to make substantially more reliable judgments than those of a non-expert. *Id.* However, "[s]pecial knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias." *Matter of N.L.,* 754 P.2d at 867.

At the severance hearing, the tribal social worker testified that she is specially educated to work with the Pueblo and that she had worked with the Pueblo for three years. She stated that during those years, she had worked with a number of families whose children were placed in foster care. She further testified that K.J.R. and the Pueblo had entered an agreement by which K.J.R. would make self-referrals to specific organizations for alcohol counseling and parenting skills, engage in family and psychological counseling and attempt to locate housing, but that K.J.R. had failed to follow the agreement. She added that K.J.R. later had called her to check on the children but had not requested assistance with regaining them. The social worker concluded that returning the child to K.J.R. would put the child at risk of serious physical or emotional harm.

In addition, a DES caseworker with more than five years' experience at Child Protective Services, a master's degree in special

**112**

education and rehabilitation and prior experience with cases involving the Indian Child Welfare Act, testified that services first were offered to K.J.R. in February 1988 and that in April 1988, K.J.R. had entered a six-month case-plan agreement with DES. The agreement provided that K.J.R. would attend alcohol awareness and parenting classes, attend weekly Alcoholics Anonymous meetings, attempt to seek stable employment and maintain a stable residence. DES alternatively agreed to provide K.J.R. with psychological and casework services, to meet with her regularly and review her progress and to facilitate visits with her children. The caseworker testified that he arranged the appropriate and necessary services through the Phoenix Indian Center and made efforts to get K.J.R. to the center so that she could participate but that she gradually stopped participating within two to three months. The caseworker also testified that he reiterated to K.J.R. the continuing availability of services at the Phoenix Indian Center in September 1989 and on March 7, 1990, the date of the severance hearing. He concluded that K.J.R. was not capable of providing minimally adequate care or concern for the child.

■ The record therefore demonstrates that the trial court received testimony from two expert witnesses that K.J.R.'s continued custody of the child was likely to result in damage to the child's emotional or physical well-being. It supports the decision that the witnesses' educational backgrounds and experience qualified them as experts as required by the Act. *See* 25 U.S.C. 1912(f).

In involuntary proceedings, the Act also requires that the termination be supported by evidence beyond a reasonable doubt that the parent's continued custody of the child is likely to result in serious emotional or physical damage to the child. 25 U.S.C. 1912(f).[7] This is in addition to meeting the Arizona requirement that parental rights may only be terminated for a number of

stated reasons. *See In re Dependency of Roberts*, 46 Wash.App. 748, 732 P.2d 528, 531 (1987) (proof beyond reasonable doubt that parent's custody likely to result in Indian child's emotional or physical damage in addition to state parental termination requirements). Included among the Arizona statutory grounds for termination are:

3. That the parent is unable to discharge the parental responsibilities because of mental illness, mental deficiency or a history of chronic abuse of dangerous drugs, controlled substances or alcohol and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period.

\* \* \* \* \* \*

6. That the child is being cared for in an out-of-home placement under the supervision of the juvenile court, the division or a licensed child welfare agency, that the agency responsible for the care of the child has made a diligent effort to provide appropriate remedial services and that:

\* \* \* \* \* \*

(b) The child has been in an out-of-home placement for a cumulative total period of two years or longer pursuant to court order, the parent has been unable to remedy the circumstances which cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

A.R.S. § 8–533(B)(3), (6)(b).

In addition to the requirement of subsection B(3) that K.J.R.'s parental rights could be terminated upon proof by clear and convincing evidence that she is unable to discharge her parental obligation because of her mental illness and history of alcohol abuse, the record has to demonstrate that her condition "deprives [her] of the ability to effectively care for the child." *Appeal in Maricopa County Juvenile Action No. JS–6831*, 155 Ariz. 556, 558, 748 P.2d 785,

---

7. This is a higher standard of proof than that required in parental termination proceedings

not covered by the Act. *See* A.R.S. § 8–537(B).

787 (App.1988) (quoted in *Juvenile Action No. J–9956,* 818 P.2d at 164). Furthermore, under subsection B(6), the court must ascertain that the child is adoptable. *Appeal in Maricopa County Juvenile Action No. JS–6520,* 157 Ariz. 238, 244, 756 P.2d 335, 341 (App.1988) (cited in *Juvenile Action No. J–9956,* 818 P.2d at 164).

The trial court heard evidence from expert witnesses and found beyond a reasonable doubt that K.J.R. was unable to discharge her parental responsibilities due to her mental illness and chronic alcohol abuse and that there were reasonable grounds to believe that the condition will continue for a prolonged indeterminate period of time. *See* A.R.S. § 8–533(B)(3). It also made the requisite findings that the child had been in out-of-home placement for more than two years, that K.J.R. had been unwilling to remedy the circumstances causing the child's foster-care placement, that there were grounds to believe that K.J.R. would be unable to provide adequate and effective parental care in the foreseeable future and that the child's foster family plans to adopt her if K.J.R.'s parental rights are severed. *See* A.R.S. § 8–533(B)(6)(b). Therefore, the court satisfied Arizona's parental termination requirements.

> Section 1912(d) of the Act requires that: [a]ny party seeking ... termination of parental rights to an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

This also must be proven beyond a reasonable doubt. *People in Interest of P.B.,* 371 N.W.2d 366, 372 (S.D.1985).

In compliance with the federal and state statutes, the trial court determined beyond a reasonable doubt that DES had made diligent efforts to prevent the need for the child's continued out-of-home placement and termination of K.J.R.'s parental rights. Remedial services and rehabilitative programs repeatedly were offered to K.J.R. yet, in the opinion of the Pueblo's own social worker and a DES caseworker, K.J.R. did not take advantage of the programs and it would be detrimental to return the child to her.

The record supports the conclusion that K.J.R. is unfit as a parent of this child. The termination of K.J.R.'s parental rights is affirmed.

JACOBSON, P.J., and EUBANK, J., concur.