NOT DESIGNATED FOR PUBLICATION

No. 123,590

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of E.L.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KELLIE HOGAN, judge. Opinion filed November 24, 2021.
Affirmed.

*Grant A. Brazill*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant
natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GREEN, P.J., CLINE, J., and BURGESS, S.J.

PER CURIAM: E.L. was taken from her parents shortly after birth, based mainly on
evidence of significant physical abuse of E.L.'s older sibling, D.L. Father challenges the
sufficiency of the evidence in support of the district court's determination under the
Indian Child Welfare Act (ICWA) that the State made active efforts to prevent the
breakup of the Indian family. He also claims the court should have excluded the State's
expert witness from the termination hearing since the State did not provide an expert
witness disclosure under K.S.A. 2020 Supp. 60-226(b)(6). We find clear and convincing
evidence supports the district court's termination of parental rights and that there was
evidence beyond a reasonable doubt (supported by a qualified expert) that the continued
custody of E.L. by the parents was likely to result in serious emotional or physical
damage to E.L. (as required by ICWA). We also find Father has not established the State

1

had to disclose its expert because he failed to show K.S.A. 2020 Supp. 60-226 applied in this matter. We affirm the district court's judgment.

FACTS

On October 21, 2019, officers were dispatched to Saint Joseph Hospital in Wichita, Kansas, for a welfare check of a newborn baby, E.L. When they arrived, a hospital social worker reported that multiple nurses and doctors had complained Mother was not following their instructions on how to properly care for E.L. Nursing staff had to educate the teenage parents multiple times on how to hold E.L. and on safe sleep, out of concern the parents were not supporting E.L.'s head and were laying E.L. in ways that were obstructing E.L.'s airway. Nursing staff also twice counseled Mother about overfeeding E.L. Mother resisted their advice and instructions. Upon contacting the Kansas Department for Children and Families (DCF), the hospital social worker learned both parents had pending criminal charges for aggravated child endangerment for another child, D.L. The parents lost custody of D.L. about a year before, after his admittance to the hospital at five months old with multiple fractures.

Upon being contacted regarding E.L., a DCF social worker, Marisa Thorne, interviewed the parents at the hospital. When Thorne asked about D.L.'s case, they denied knowing how D.L. was injured and even denied that he sustained any injury at all. They both accused the hospital of mixing up D.L.'s x-rays because they claimed the date of birth they had seen on the x-rays was incorrect.

*Initiation of CINC proceedings*

After the State initiated child in need of care (CINC) proceedings, the district court placed E.L. in the temporary custody of DCF and ordered DCF or its designee to prepare

2

a case plan. The court also found ICWA applied, since Mother is an enrolled member of the Citizen Potawatomi Nation (the Tribe).

On November 21, 2019, both parents received the same case plan from DCF's designee, Saint Francis Ministries (SFM). The plan required each parent to complete the following: (1) sign all necessary releases for SFM; (2) obtain and maintain appropriate housing; (3) obtain and maintain full-time employment and provide documentation to SFM; (4) abstain from the use of illegal drugs, alcohol, and any prescription medication without a valid prescription throughout the duration of the case; (5) complete a substance abuse evaluation and follow all recommendations; (6) submit to random urinalysis (UA) and hair follicle testing; (7) complete a series of domestic violence classes; (8) complete a WASAC protective parenting class; and (9) complete a clinical assessment and follow any resulting recommendations.

At the November 25, 2019 adjudication hearing, the district court granted the Tribe's motion to intervene. Upon the State's request, the court placed E.L. in an Indian home, which the Tribe selected and where E.L.'s sibling, D.L., was located. Since the Tribe-approved home was in Oklahoma, the Tribe agreed to transport E.L. to Wichita for weekly visits with the parents. An evidentiary adjudication hearing was set for February 26, 2020.

Relying mainly on D.L.'s injuries, the State moved to terminate the parental rights of both parents a few weeks later, based on:

- K.S.A. 2020 Supp. 38-2269(b)(2)—conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature;
- K.S.A. 2020 Supp. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child;

3

- K.S.A. 2020 Supp. 38-2269(b)(6)—unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death; and

- K.S.A. 2020 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

At the February 26, 2020 adjudication hearing, the district court found E.L. to be a child in need of care and scheduled a hearing on the termination of parental rights. In the meantime, it adopted the case plan as orders of the court and ordered that visitation be at the discretion of DCF or DCF's designee.

*Visitation issues*

On March 17, 2020, the Tribe notified SFM that it had issued an out-of-state travel ban because of the COVID-19 pandemic, so it could no longer transport E.L. for weekly visits to Kansas. The Tribe offered to reimburse the parents for their travel costs if they would be willing to travel to Oklahoma for in-person visits. The Tribe understood that while neither parent had a vehicle, Mother's parents had one.

The parents did not travel to Oklahoma for visitation, so SFM set up weekly virtual visits with E.L. The virtual visits were SFM's idea. SFM personnel contacted the Tribe at least monthly, and sometimes multiple times per month, to ask about the travel ban and the Tribe's ability to transport E.L. for in-person visits. The Tribe lessened its travel restrictions on September 2, 2020, but it was only able to transport E.L. for in-person visits once per month because of a staff shortage. The Tribe offered to arrange for additional in-person visitation at another tribe's facility in Tonkawa, Oklahoma, to minimize the parents' drive, but the parents were unable to take advantage of this offer. SFM arranged for the virtual visits to continue, so the parents then had one in-person and three virtual visits each month.

4

*Termination hearing*

The district court held a termination hearing for both parents on October 26 and 27, 2020. The State presented testimony from several witnesses, including two law enforcement officers and a physician involved in D.L.'s case, along with social workers involved in E.L.'s case from the Tribe, DCF (Thorne), and SFM. Father testified and called another SFM social worker to testify on his behalf. Mother testified and called her juvenile case worker to testify on her behalf.

1. *D.L.'s injuries*

Dr. Kerri Weeks, a child abuse pediatrician who has been involved in the child-at-risk evaluation team for over 10 years, testified about her consultation on D.L.'s injuries. She said D.L. was five months old when the parents brought him to the hospital on September 11, 2018, for right leg pain. The parents provided no history of trauma, and he had visible bruising. The parents reported D.L. had just rolled over for the first time the prior week.

During D.L.'s examination, hospital staff discovered several injuries: (1) a recent right femur fracture, (2) a skull fracture of undetermined age, (3) an older proximal right radius fracture that was healing, and (4) two rib fractures. Dr. Weeks explained that any fracture in a nonmobile infant like D.L. is concerning because, at that age and stage of development, they are unable to injure themselves. She also indicated that there should be an adequate history explaining the injury.

Dr. Weeks believed D.L.'s femur fracture was an abusive injury. She dismissed Mother's later explanation that D.L.'s foot had been caught in his crib slats as a possible cause. While she believed the skull fracture was the only injury that could have potentially been accidental, in the context of the many other abusive injuries, she

5

believed it was also an abusive injury. She testified the pattern of bruises in the soft part of D.L.'s cheek is a common pattern in young infants with abuse, and rib fractures are also highly associated with infant shaking and abusive head trauma. The combination of skull and rib fractures also evidenced abuse since these injuries are seen together in abusive head trauma. She explained how the x-rays revealed the fractures happened at different times, since the right radius and rib fractures showed signs of healing. The different time frames for the fractures led her to believe the abuse was ongoing.

Dr. Weeks described the necessity for a follow-up consultation in two weeks for young children suffering from suspected abuse, to look for more fractures which may have been difficult to see on the initial visit. D.L.'s follow-up consultation revealed two more fractures, one in his right ulna and one in his left humerus. She confirmed these two fractured arms also suggested abuse in a five-month-old child. In her opinion, D.L. was physically abused several times. Dr. Weeks testified she believed if D.L. was returned to the parents, he would end up dead since the abuse was progressing. She said she would be "very hesitant to put a child in an environment where this type of abuse has occurred."

2. *Investigation of D.L.'s injuries*

Jessica Helwi, a patrol officer with the Wichita Police Department, and LaTavia Allen, a detective from that department's exploited and missing child's unit, each testified about being called to the hospital on September 11, 2018, to investigate suspected abuse of D.L. Helwi discussed the doctor's report that D.L.'s diaper had not been changed for about 12 hours when the parents brought him. She mentioned a doctor observed Mother handling D.L. roughly, so the doctor and nurses stepped in to oversee Mother and ensure D.L. was not further harmed. She also recounted how the hospital staff first thought D.L. was very dirty, but later discovered he had bruises on his face and hands.

6

Helwi and Allen were only able to interview Mother about what happened to D.L. since Father left when he learned the police had been called because he had active arrest warrants for other matters.

Mother first denied knowing what happened to D.L., but then later said he had recently gotten his leg stuck in between the crib slats. When Helwi asked Mother about his other injuries, Mother told her she believed D.L. might be anemic or have a bone disease, which caused him to bruise easily.

Allen had Mother go through a timeline, recalling all the events in the four days before D.L.'s hospital admission. Apart from Mother telling Allen that her own mother played with D.L. for about an hour the day before, Mother never mentioned that anyone other than herself and Father were around D.L. during this time.

Allen interviewed Mother again a few days later, after learning the extent of D.L.'s injuries. Mother told Allen that Father sometimes threw D.L. in the air and caught him, which could be a source for some of D.L.'s injuries. Mother also suggested some of the fractures could have occurred after D.L. slid out of the swing in which they sometimes put him to sleep. Mother told her D.L. woke up at 5 a.m. screaming on the floor three days ago because he had slid down out of the swing onto the floor. Mother told Allen that D.L. had fallen out of the swing several times. Mother had no explanation for why both of D.L.'s arms were fractured. When Allen inspected Mother's home, the swing looked like it had not been used recently because there were clothes and water bottles inside it. She measured the space between the crib slats and discovered it was only two inches.

3. *Reintegration efforts*

Thorne, the DCF permanency specialist assigned to the intake of E.L.'s case, also testified. She explained how the hospital staff notified her of their concerns about the

7

parents' care for E.L. and the parents' refusal to take direction from the hospital staff. She also discussed how the parents denied to her that D.L. was even hurt and downplayed the criminal and CINC investigation into D.L. Thorne testified she was concerned about sending E.L. home with the parents since both parents had substantiations for physical abuse on their son.

Tracey Humphrey, a qualified expert witness under ICWA and the Tribe's Indian Child Welfare case manager assigned to E.L.'s case, testified about the parents' visitation with E.L. She discussed the Tribe's travel ban and SFM's initiation of virtual visits during the ban. She also testified she would not be comfortable returning E.L. to the parents' custody. She believed SFM had made active but unsuccessful efforts to rehabilitate and prevent the breakup of the Indian family. She testified the parents had not changed their behavior or worked their services, including refusing to undergo drug tests and to allow SFM into the home. She said she would be concerned for E.L.'s safety if E.L. was returned to Mother and Father. In her opinion, continued custody with the parents would likely result in serious physical harm to E.L. She also testified she did not believe allowing the parents more time would be helpful, since they were unwilling to take advantage of the services offered to them. When asked, Humphrey admitted she was unaware of any additional services SFM could have offered to the parents that might have helped them succeed. She supported the State's motion to terminate both parents' parental rights to E.L. and believed termination would be in E.L.'s best interests.

Lavana Faine, the SFM case manager assigned to E.L.'s case, also testified about the parents' visitation with E.L. She said SFM staff asked Humphrey all the time when the Tribe's out-of-state travel ban would be over and when the parents' in-person visits could resume. She testified that if SFM had not recommended the video visits, then the parents would have only seen E.L. once a month.

8

Faine testified Father did not complete the court-ordered clinical evaluation or participate in individual therapy. Although he told her he completed a psychological evaluation in his criminal case, he never gave her a copy of the documentation for that evaluation. Faine reported that Father told her he was employed but never provided proof of employment. She also reported that he advised her he completed anger management classes, and she again requested documentation.

Father's last three hair follicle tests in February, June, and September 2020 were positive for methamphetamine. In fact, Faine testified Father never had a negative hair follicle test. Faine acknowledged Father had had some negative UA tests, in April, July, and September 2020. He failed to submit UAs on May 13, June 10, and June 23, 2020. She told Father he needed to undergo a substance abuse evaluation after he refused to undergo a hair follicle test in January. She continued to tell him during their monthly meetings that he needed this evaluation to reintegrate with E.L., but he never completed one. When Father speculated about the unavailability of in-person substance abuse evaluations considering the COVID-19 pandemic, Faine reminded him she had told him before that he could complete the evaluation by telephone. Faine reported Father told her he believed his hair products caused his multiple positive hair follicle tests.

Faine testified she would not be comfortable returning E.L. to the parents, based on: (1) the seriousness of D.L.'s injuries, (2) the parents' failure to take responsibility for those injuries, (3) Mother's failure to engage in the recommended therapy, (4) both parents' positive drug tests, (5) Father's failure to engage in substance abuse evaluation or treatment, and (6) the lack of adequate housing. She said she did not believe the parents were likely to change in the foreseeable future since, from the beginning, they told her they were not going to comply with all the court orders. She testified she believed it was in E.L.'s best interests to permanently remain with D.L. and the foster parents with whom E.L. had bonded. She discussed the concept of "child time," meaning children perceive time differently than adults. She noted E.L. had been in DCF custody since she was four

9

days old and was thriving with her foster parents and brother. Faine testified she supported the State's motion to terminate parental rights.

Father called Deanna Denson, a SFM social worker who scheduled and supervised visitations in E.L.'s case, to testify in his defense. Denson testified about SFM's efforts to communicate with the Tribe to ask about ending the travel ban and resuming in-person visits. Denson admitted that, in the beginning, the foster mother could be distracting during the virtual visits by playing with E.L. But she addressed the issue with the foster mother, which led to the foster father supervising the visits instead. Denson stated the visits supervised by the foster father proceeded without issue for a while. Once the parents informed her otherwise, she supervised the visits herself.

Mother presented testimony from Misty Jimison, her home-based supervision officer in her separate, juvenile offender case. Jimison testified Mother was compliant in her juvenile offender case, doing everything Jimison asked her to do.

4. *Testimony from Father*

When Father testified, he was asked why he lost custody of both D.L. and E.L. He denied knowing why he had lost custody. He also said he believed that, other than the right leg injury, D.L.'s other injuries were caused either when Mother was pregnant or during birth. He said, "[T]here's a bunch of lies going around" about the nature and extent of D.L.'s injuries. Father testified his criminal case related to D.L. was over. He reported taking an "*Alford* plea" to the aggravated battery charge in that case.

Father admitted he had three positive hair follicle tests for methamphetamine, but he blamed the test results on his hair products. Father testified he has never used methamphetamine in his life. Father agreed Faine's requests that he obtain a substance abuse evaluation and undergo treatment were reasonable. He did not comply with her

10

requests because he did not think treatment would help. He said, based on his experience, he would only have to undergo UAs in treatment, and he claimed he could pass UAs. He testified he believed his hair follicle tests would continue to come back "dirty," based on his hair products, so he thought treatment would be pointless.

5. *District court's ruling*

At the end of the hearing, the district court ultimately found both parents to be unfit under K.S.A. 2020 Supp. 38-2269(b)(2) (abusive conduct toward a child), (b)(4) (physical abuse or neglect of a child), and (b)(6) (unexplained injury of another child of the parent). The court also found the evidence of unfitness was unlikely to change in the foreseeable future, explaining, "[B]ecause here we are one year later, and we are no closer to being able to reintegrate this child than we were on the day that the child came into custody." The court noted its duty to consider child time and explained:

> "[E.L.] has spent 100 percent of her life in foster care, and there's just no evidence that
> the Court could rely on to believe that anything will be different in three or six months or
> even a year. We have had one year and we are just no closer than where we were."

The district court found it to be in E.L.'s best interests to terminate the parental rights of both parents.

Additionally, under ICWA, the district court found: (1) reasonable and active efforts were made to prevent the breakup of the Indian family and those efforts did not succeed and (2) there was evidence beyond a reasonable doubt (and supported by a qualified expert) that the continued custody of E.L. by the parents was likely to result in serious emotional or physical damage to E.L.

ANALYSIS

Father has not appealed the termination of his parental rights under Kansas law, nor has he appealed the district court's ICWA finding that continued custody was likely to result in serious emotional or physical damage to E.L. He only challenges the sufficiency of the evidence supporting the court's ICWA finding that the State made active efforts at reunification. He also raises an evidentiary challenge to Dr. Weeks' testimony, claiming the State should have disclosed Dr. Weeks as an expert witness under K.S.A. 2020 Supp. 60-226. We do not find his arguments to be persuasive. We find the evidence sufficiently supports the court's active efforts finding and, under the facts of this case, the State did not have to disclose Dr. Weeks under the revised Kansas Code for Care of Children (KCCC). See K.S.A. 2020 Supp. 38-2245.

*Termination of parental rights under ICWA*

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Under Kansas law, the termination of parental rights is governed by K.S.A. 2020 Supp. 38-2266. But when the child is an Indian child, ICWA also applies. See *In re L.M.B.*, 54 Kan. App. 2d 285, 297-98, 398 P.3d 207 (2017); *In re H.A.M.*, 25 Kan. App. 2d 289, 295-96, 961 P.2d 716 (1998). Kansas courts have adopted a two-step approach for termination of parental rights cases involving an Indian child: (1) first, applying the state law test for terminating parental rights set forth in K.S.A. 2020 Supp. 38-2269 and (2) second, applying ICWA standards. See *In re L.M.B.*, 54 Kan. App. 2d at 297-98; *In re H.A.M.*, 25 Kan. App. 2d at 295-96. But when a parent only challenges the sufficiency of the evidence under ICWA on appeal, as is the case here, we need not address the sufficiency of the evidence under Kansas law. See *In re L.M.B.*, 54 Kan. App. 2d at 298.

*ICWA: active efforts requirement*

To terminate parental rights to an Indian child, ICWA requires: (1) under the Indian Child Welfare Act, 25 U.S.C. § 1912(f) (2018), "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child"; and (2) under 25 U.S.C. § 1912(d), that the party seeking termination of parental rights to the Indian child under State law "satisf[ies] the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." ICWA does not elaborate on these requirements. That said, there are now binding federal regulations for state courts to follow in Indian child-custody proceedings that interpret these ICWA requirements. See 81 Fed. Reg. 38,778 (June 14, 2016); see 25 C.F.R. §§ 23.101-144 (2016).

In 1979, the Department of the Interior, through the Bureau of Indian Affairs, (the Department) issued several rules implementing ICWA—which included various binding regulations codified at 25 C.F.R. § 23 (none of which are relevant here), as well as nonbinding, recommended guidelines for State courts to apply in Indian child-custody proceedings. See 44 Fed. Reg. 67,584 (1979) (guidelines); see also 81 Fed. Reg. 38,778, 38,785-86 (2016) (noting Department made clear in 1979 that guidelines addressing State-court Indian child-custody proceedings not intended to have binding effect). The Department published an updated version of those nonbinding guidelines in 2015. See 80 Fed. Reg. 10,146-02 (2015). But the Department has since recognized a need for binding standards for Indian child-custody proceedings in State courts, and on June 14, 2016, the Department issued a final rule that added a new subpart to 25 C.F.R. § 23 to address state court implementation of ICWA. See 81 Fed. Reg. 38,778, 38,779, 38,782-86 (2016); see 25 C.F.R. §§ 23.101-144. The final rule also updated certain definitions that 25 C.F.R. § 23 incorporates by reference, including—relevant here—the definition of "active

efforts" at reunification. See 81 Fed. Reg. 38,778, 38,864-65 (2016); see 25 C.F.R. § 23.102 (providing terms not defined have meaning assigned in 25 C.F.R. § 23.2); see 25 C.F.R. § 23.2 (defining "active efforts"). While both parties rely on the 2015 version of the nonbinding guidelines in their briefs, we apply the binding federal regulations adopted in 2016.

Father's only argument under ICWA is that there was not clear and convincing evidence supporting the district court's finding that the State made active efforts at reunification, as required by 25 U.S.C. § 1912(d). Father presents two arguments on this issue: (1) The State did not make active efforts towards his visitation with E.L. and (2) the State did not make active efforts to assist him in meaningfully availing himself of community resources and services.

The 2016 federal regulations provide the following definition for "active efforts" and a nonexhaustive list of examples of what may constitute active efforts:

> "Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:
>
> "(1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
>
> "(2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

14

"(3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

"(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

"(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

"(6) Taking steps to keep siblings together whenever possible;

"(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

"(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

"(9) Monitoring progress and participation in services;

"(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

"(11) Providing post-reunification services and monitoring." 25 C.F.R. § 23.2.

Several statements in the preamble of the final rule mentioned above clarify the active efforts requirement. Relevant here, the Department stated:

"The final rule clarifies that, where an agency is involved in the child-custody proceeding, active efforts involve assisting the parent through the steps of a case plan, including accessing needed services and resources. This is consistent with congressional intent—by its plain and ordinary meaning, 'active' cannot be merely 'passive.'" 81 Fed. Reg. 38,778, 38,790 (2016).

15

The preamble also provided that the sufficiency of "active efforts" will vary case-by-case and the final rule's definition of active efforts retains a state court's discretion to consider the facts and circumstances of each case. 81 Fed. Reg. 38,778, 38,791 (2016). Lastly, the preamble noted that some commenters suggested requiring a minimum number of the listed examples to reach the active efforts threshold, but the Department responded that "[t]he minimum actions required to meet the 'active efforts' threshold will depend on unique circumstances of the case." 81 Fed. Reg. 38,778, 38,791 (2016).

Neither ICWA nor its regulations provide the standard of proof required for the State to prove it made active efforts at reunification. In the preamble of the final rule, the Department explicitly declined to establish a uniform standard of proof. 81 Fed. Reg. 38,778, 38,816 (2016). Thus, we continue to use the same standard of proof Kansas has used to determine whether the State has met its burden, which requires the State prove, by clear and convincing evidence, that it used active efforts. See *In re L.M.B.*, 54 Kan. App. 2d at 303. Thus, we ask whether, after reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found the district court's determination to be highly probable. See 54 Kan. App. 2d at 304.

### 1. *Visitation with E.L.*

One example of active reunification efforts in the ICWA regulations is "[s]upporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child." 25 C.F.R. § 23.2(7). Father argues the State did not make active efforts because in-person visitation stopped for a time, and only occurred once a month when it resumed. He also argues the virtual visits were not "the most natural setting possible," and the foster parents hindered the visits.

16

First, the visitation example is only one of several examples of active reunification efforts listed in the ICWA regulations; it is not a requirement of ICWA. See 25 C.F.R. § 23.2. Even so, reviewing the evidence in the light most favorable to the State, as is required here, a rational fact-finder could have found it highly probable that SFM used active efforts in supporting Father's visitation with E.L. While it is true the amount and type of visitation might be inadequate in a typical case, this was not a typical case. And, again, what constitutes "active efforts" depends on the facts and circumstances of each case.

We find SFM made active efforts to support regular visits with the parents. First, the limitations placed on visitation were outside of SFM's control. The Tribe is the one who limited visitation, first by launching a travel ban during the COVID-19 pandemic and then by reducing transportation of E.L. to Wichita from four times a month to once a month, based on its staffing shortage. Yet, despite these limitations, SFM continued to support visitation by initiating weekly virtual visits with the parents. While no one claims virtual visits with a toddler are ideal, if SFM had not launched such visits, the parents would have had no contact with E.L. And each time the parents complained about interference from the foster parents in the virtual visits, SFM stepped in and addressed their complaints.

Father next argues the level of visitation was unreasonable based on DCF policies and procedures. He references various policies which acknowledge the parents' right of reasonable contact with their children who are in out of home placement, emphasize the importance of such contact, and suggest that such contact should occur at least once a week "in naturally occurring settings." Still, as Father rightly admits, the manual he references contains an exception to the visitation requirements when safety issues threaten the participants. See Kansas Department for Children and Families, Policy and Procedure Manual § 3237(G) (2021). While Father claims "courts" may limit parental contact with the child, the exception is not so limited. Here, the COVID-19 pandemic

17

presented a safety issue that threatened participants and, thus, justified a departure from DCF's general visitation standards. Further, by starting virtual visits, SFM ensured the parents continued to have weekly contact with E.L. Neither the Tribe nor SFM prohibited the parents from traveling to Oklahoma to continue weekly, in-person visits—indeed, the Tribe even tried to facilitate those by offering to pay the parents' travel costs and transport E.L. closer to Wichita. We do not find SFM violated DCF's policies or failed to engage in active efforts to support visitation.

Father argues he should have been given more "expansive" visitation since he was in contact with SFM and acted appropriately during his visitation with E.L. Yet, Father fails to acknowledge how his behavior outside the visits prohibited such expansion. Indeed, Faine testified it was the parents' conduct *outside* of the visits that was likely to result in serious emotional or physical damage to E.L. and which impacted her opinion about whether to send E.L. home with them. She also testified Father did not transition to in-home, in-person visits at Father's house because of his positive drug tests and failure to engage in substance abuse treatment.

Viewing the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that SFM made active but unsuccessful efforts to prevent a family breakup, including active efforts to support Father's visitation with E.L.

2. *Active efforts to assist Father in meaningfully availing himself of community resources and services*

Father next argues the State did not make active reunification efforts to assist him in meaningfully availing himself of community resources and services. He claims SFM failed to adequately educate him about substance abuse treatment and failed to provide adequate transportation to treatment. He also claims SFM failed to educate him about the court-ordered WASAC protective parenting class, including where to go to complete it.

18

One example of active efforts at reunification set forth in the ICWA regulations is "[i]dentifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services." 25 C.F.R. § 23.2(2). Another example is: "[i]dentifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources." 25 C.F.R. § 23.2(8). Again, as mentioned above, these are just two examples of active reunification efforts, not requirements of the ICWA. See 25 C.F.R. § 23.2.

Father essentially asks us to reweigh the evidence, by emphasizing his testimony regarding his alleged misunderstanding of the nature of the services required for reintegration and discounting Faine's testimony about her efforts to explain the importance of his completion of those services. Yet, the district court judged the credibility of and weighed Father's testimony against the testimony from Faine and the State's other witnesses. We will not retread that ground. *In re B.D.-Y.*, 286 Kan. at 705. Instead, our job is to determine whether, after reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found the district court's determination to be "highly probable." 286 Kan. at 705-06. Given the evidence here, we are indeed convinced.

First, there is clear and convincing evidence in the record that Faine went over Father's case plan with him—which included both the requirement that he complete a WASAC parenting class and the requirement that he complete a substance abuse evaluation and follow all recommendations from the evaluation. Faine continued to actively engage with Father by regularly meeting with him and discussing his progress. Faine explained how she employed active efforts here by giving the example that when Father walked to the office for his meetings with her, she would take him home. She also told Father about all of the free or reduced cost options for him to complete his court-

19

ordered services, such as free parenting classes and a substance abuse evaluator who charged on a sliding scale. Further, when Father tried to excuse his failure to complete a substance abuse evaluation by claiming he did not believe businesses were open again, Faine explained he could complete the evaluation by telephone.

Father faults the State for his claimed misunderstanding about the "value" of substance abuse treatment. Yet, he admitted he understood he needed to complete a substance abuse evaluation to regain custody of E.L., evidencing Faine explained the importance of this task. And despite his claim on appeal that "he did not really know what substance abuse treatment meant," he testified he completed both a substance abuse evaluation and substance abuse treatment as part of a prior criminal case.

A reasonable fact-finder could find it highly probable that Father's failure to undergo substance abuse evaluation and treatment was not because he did not understand what it involved, but, instead, because he was not prepared to address his substance abuse issues. Father repeatedly tested positive for methamphetamine in his hair follicle tests yet denied he had ever used methamphetamine. Instead, he blamed the failure on the hair products he used—and apparently continued to use, despite their alleged effect on his test results.

Faine regularly counseled Father about his substance abuse problem, but she could not make him attend treatment. Other courts addressing a similar situation have held a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the State has taken active efforts to reunify an Indian family. See *N.A. v. State*, 19 P.3d 597, 603-04 (Alaska 2001); *Matter of Maricopa County Juvenile Action No. JS-8287*, 171 Ariz. 104, 113, 828 P.2d 1245 (Ariz. Ct. App. 1991); *In re Declaring M.E.M.*, 209 Mont. 192, 197-98, 679 P.2d 1241(1984); *State ex rel. Juvenile Department v. Woodruff*, 108 Or. App. 352, 357, 816 P.2d 623 (1991). Likewise, we do

not find Father's unwillingness to participate in substance abuse treatment meant SFM did not engage in active efforts to persuade him to do so.

As to Father's claim that SFM did not engage in active reunification efforts because SFM did not transport him to substance abuse treatment or to a mental health evaluation, the evidence does not suggest transportation was the barrier to completing these tasks. First, Father testified he did complete a clinical assessment, so he apparently did not need transportation to complete this task. Next, Father does not claim he ever requested transportation or bus passes from Faine. Yet, since Faine took him home from meetings when he did not have transportation, she was clearly willing to provide it. What's more, as to a substance abuse evaluation, Faine told him he could complete it by telephone. Father testified he did not complete substance abuse treatment because he did not believe it would help, not because he lacked transportation. We do not find Father's belated claim that he lacked transportation to mean SFM did not actively try to help him complete these case plan tasks.

Father focuses on ways that he claims SFM failed to help him while ignoring his lack of engagement. SFM offered many services and suggestions to address Father's barriers to participation, to which he responded with an unwillingness to participate. Father also ignores other ways SFM actively strove towards reunification, including taking steps to keep siblings together by placing E.L. in the same foster home as D.L. (an example of active efforts found in 25 C.F.R. § 23.2[6]). Viewing the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that SFM made active but unsuccessful efforts to reunify this Indian family—those active efforts including assisting Father in meaningfully availing himself of community resources and services.

*Admissibility of Dr. Weeks' testimony*

Dr. Weeks provided expert testimony at the termination hearing about D.L.'s injuries and her opinion on the cause of those injuries. Father claims the State had to disclose Dr. Weeks in accordance with the expert witness disclosure requirements set forth in K.S.A. 2020 Supp. 60-226(b)(6). Since it did not, he argues the district court should have exercised its discretion under K.S.A. 2020 Supp. 60-237(c) to prohibit Dr. Weeks' testimony at the hearing. We generally review a district court's decision to admit or exclude expert testimony for an abuse of discretion. See *Miller v. Johnson*, 295 Kan. 636, 687-88, 289 P.3d 1098 (2012), *overruled on other grounds by Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019). That said, when a district court's admission of expert testimony turns on statutory interpretation, this court's review is de novo. See *Bullock v. BNSF Railway Co.*, 306 Kan. 916, 921, 399 P.3d 148 (2017).

The KCCC sets forth the procedures for CINC matters. See K.S.A. 2020 Supp. 38-2203(a). While Father acknowledges the KCCC includes a statute which governs discovery in such matters, he misconstrues it. See K.S.A. 2020 Supp. 38-2245. The civil discovery procedures Father relies on here only apply (1) after a hearing, and (2) after a finding that the Chapter 60 civil discovery procedures will expedite the proceedings. K.S.A. 2020 Supp. 38-2245(a). This likely stems from one of the stated policies of the KCCC—to dispose of all proceedings without unnecessary delay. See K.S.A. 2020 Supp. 38-2201(b)(4). There was no such hearing or finding in this case, nor does the record reflect that Father requested one. Moreover, a panel of this court has described a judge's decision to apply the civil discovery procedures in this context as "a matter of discretion." *In re K.W.C.*, No. 112,904, 2015 WL 6112013, at *8 (Kan. App. 2015) (unpublished opinion).

Additionally, the KCCC only requires a party to disclose the names of its potential witnesses "upon request." See K.S.A. 2020 Supp. 38-2245(b). Father does not assert that he requested such disclosure, and no such request appears in the record on appeal.

Father asserted no other basis, either to the district court or to us, that the admission of Dr. Weeks' testimony was improper. As a general rule, unless there are exceptional circumstances, appellate courts do not consider issues on appeal that were not raised by the parties. *State v. Adams*, 283 Kan. 365, 367, 153 P.3d 512 (2007). Further, "failure to brief and argue an issue constitutes a concession of an issue by the parties." *State v. Laborde*, 303 Kan. 1, 7-8, 360 P.3d 1080 (2015) (*overruled on other grounds by Balbirnie v. State*, 311 Kan. 893, 468 P.3d 334 [2020]); see *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015).

Since Father has failed to establish the discovery procedures requiring expert witness disclosure applied here, the court did not abuse its discretion in denying the parents' motion to exclude Dr. Weeks' testimony.

Affirmed.